Barry K. ARRINGTON, Plaintiff–
Appellant,

v.

Mike PALMER and Steve Burton,
Defendants–Appellees.

No. 97CA1052.

Colorado Court of Appeals,
Div. II.

Nov. 18, 1998.

As Modified on Denial of Rehearing,
Dec. 24, 1998.*

* Quinn, J., would GRANT.

James P. Rouse, Englewood, Colorado, for Plaintiff–Appellant.

Gene R. Nichol, Sr., University of Colorado Law School, Boulder, for Defendant–Appellee Mike Palmer.

Powers Phillips, P.C., Richard W. Daily, Denver, for Defendant–Appellee Steve Burton.

Opinion by Judge CRISWELL.

In this action for defamation, plaintiff, Barry K. Arrington, appeals from the summary judgment entered in favor of defendants, Mike Palmer and Steve Burton. We affirm.

In the fall of 1996, plaintiff was a Republican Party candidate for Colorado House District 27. In the written document that is the subject of this litigation, defendants claimed to be Republican Party activists who "disagree with many of the positions taken by [plaintiff] and who do not like his style of campaigning."

According to plaintiff's complaint, defendants prepared and distributed approximately 9,000 postcards, which utilized the Republican Party logo and which were addressed to "Fellow Republicans." These postcards contained negative statements concerning both plaintiff and two other Republican Party candidates running for different offices. The postcard took the following form:

FELLOW REPUBLICANS

Citizenship is more than a Name

Citizenship is more than a Political Party

Citizenship is about Good Government

[A Republican candidate for state senate] voted against the interests of Arvada, against a community college for Arvada, and as a matter of fact he repeatedly voted against public education in general! *Days after his vote against Arvada's Community College, his campaign manager announced that she was close to securing land for a Charter School – the very same land that the College wanted to build on! (original emphasis)*

[Another candidate for the state house] has consistently embarrassed himself and the community with his comments. His latest remark in the Washington Post would put women's rights back in the dark ages. And who can forget his *"Canned Kansas*

Prayer" that he gave on the house floor and which offended most of those in attendance. He claimed that the prayer was his own, between him and his god. *However, days later he admitted that he lied; his prayer had originated in Kansas.* If he will lie about a prayer – what else will he lie about? (original emphasis)

Perpetual candidate BARRY ARINGTON [sic], who in the past *bullied and physically threatened* those who disagreed with him, and who causes controversy whenever he speaks, is running again—this time for House District 27. (original emphasis)

Put common sense back in government. Vote against these men and cast your vote for [their Democratic opponents].

Plaintiff brought this action claiming that the statement about him was defamatory per se because it accused him of committing the crimes of harassment and/or menacing. Plaintiff further alleged that defendants knew or should have known that the statement about him was "without foundation in fact" and that defendants acted "intentionally, wantonly, and with actual malice."

Defendants responded to the complaint by filing a motion to dismiss. In that motion, defendants did not dispute the allegation that their statement was false. Instead, defendants argued that the statement was not defamatory and was constitutionally protected speech.

The trial court treated the motion to dismiss as a motion for summary judgment. After concluding that the statement was not defamatory and that it was protected by the "qualified privilege of fair comment," the trial court dismissed plaintiff's complaint. Although our analysis differs somewhat from that used by the trial court, we agree with its ultimate conclusion that the statement was protected.

## I.

Plaintiff first contends that the trial court erred in determining that the statement was not defamatory. We agree.

■ A statement is defamatory if it tends to so harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him. *Burns v. McGraw–Hill Broadcasting Co., Inc.,* 659 P.2d 1351 (Colo. 1983); Restatement (Second) of Torts §559 (1977).

■ To be defamatory, the statement need only prejudice the plaintiff in the eyes of a substantial and respectable minority of the community. *Burns v. McGraw–Hill Broadcasting Co., Inc., supra;* Restatement (Second) of Torts §559 comment e (1977).

■ A statement may be considered defamatory *per se* if it is specifically directed at the person claiming injury and if, on its face and without extrinsic proof, it is unmistakably recognized as injurious. *Lininger v. Knight,* 123 Colo. 213, 226 P.2d 809 (1951).

■ A statement is defamatory *per se* if it imputes a criminal offense. *See Walker v. Associated Press,* 160 Colo. 361, 417 P.2d 486 (1966); *see also Keohane v. Wilkerson,* 859 P.2d 291 (Colo.App.1993), *aff'd. sub nom. Keohane v. Stewart,* 882 P.2d 1293 (Colo. 1994), cert. denied, 513 U.S. 1127, 115 S.Ct. 936, 130 L.Ed.2d 882 (1995) (historically a statement is defamatory *per se* if it imputes a criminal offense).

■ To determine whether a statement is defamatory *per se,* the court must examine the statement alone, without the aid of inducements, colloquialisms, innuendoes, or explanatory circumstances. *Keohane v. Wilkerson, supra.*

■ Here, the statement at issue was that plaintiff had "physically threatened" people who disagreed with him. We agree with plaintiff that this statement would reasonably be interpreted as stating that plaintiff had threatened to use physical force upon such persons. *See Burns v. McGraw–Hill Broadcasting Co., Inc., supra* (finding that language is defamatory based on the common meaning of words utilized). Hence, we also agree that it imputed the commission of a criminal offense to plaintiff. *See* §18–3–206, C.R.S.1998 (criminal menacing); and §18–9–111, C.R.S.1998 (criminal harassment).

As an initial matter, therefore, we conclude that the trial court erred in determining that

the statement at issue was not defamatory. *See Gomba v. McLaughlin,* 180 Colo. 232, 504 P.2d 337 (1972) (defendant entitled to assert truth as defense to *per se* defamatory statement that plaintiff had "assaulted" another individual).

## II.

We do not agree, however, that the trial court erred in concluding that the statement was constitutionally protected.

■ In the interest of ensuring uninhibited, robust, and wide-open debate on matters of public concern, courts have recognized that full constitutional protection should be given to a statement of opinion relating to matters of public concern, even if, on its face, that statement contains a false factual assertion, but cannot reasonably be interpreted as stating actual facts about an individual. *See Keohane v. Stewart, supra,* relying upon *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990).

In *Keohane v. Stewart, supra,* the supreme court established a two-part inquiry to determine whether a statement is protected. The first inquiry is whether the statement is sufficiently factual to be susceptible of being proved true or false. The second inquiry is whether a reasonable person would conclude that the assertion is one of fact. The factors relevant to the second inquiry are: (1) how the assertion is phrased; (2) the context of the entire statement; and (3) the circumstances surrounding the assertion, including the medium through which the information is disseminated and the audience to whom the statement is directed.

■ Whether an allegedly defamatory statement is constitutionally privileged is a question of law which, on appeal, is reviewed *de novo. NBC Subsidiary (KCNC–TV), Inc. v. Living Will Center,* 879 P.2d 6 (Colo.1994), *cert. denied,* 514 U.S. 1015, 115 S.Ct. 1355, 131 L.Ed.2d 214 (1995); *see also Sall v. Barber,* 782 P.2d 1216 (Colo.App.1989).

In *Keohane v. Stewart, supra,* the supreme court considered whether two letters written by a citizen and published under an alias in the editorial section of a local newspaper were privileged. The first letter alleged that a conspiracy had existed between the plaintiff, who was a district judge, expert witnesses, and the defense to "let off" a defendant doctor in a criminal trial over which the plaintiff had presided. The second letter described a hypothetical situation similar to the facts involved in the proceedings over which the plaintiff had presided and stated that a judge, in agreeing to find a way out of a defendant's dilemma, is in a position "to clean up" financially, if that judge were to agree to accept money and a new home out of state in exchange for leniency.

The supreme court concluded that, with respect to the first prong of the *Keohane* inquiry, both statements contained verifiable facts or factual implications about the plaintiff. However, it also concluded that neither letter could reasonably be interpreted as stating actual facts about the plaintiff.

In reaching this conclusion, the court considered several factors, including where the letters had appeared (the editorial section of a local newspaper); that they had used "imaginative expression," such as "sickie," "terrorists," "sleaze," and "scum," which pejorative terminology was indicative of an expression of anger—a signal that the words were not to be taken literally; the circumstances and social context in which the letters had appeared, which included well-publicized past incidents of scandal in the local medical and legal professions; the use in both letters of words connoting suspicions and conjecture, rather than statements of fact; and the fact that neither letter suggested that the author was relying upon any facts not known to the public.

■ Applying the tests used in *Keohane v. Stewart, supra,* to the facts of this case, we initially note that the assertion that plaintiff had "physically threatened" people who disagree with him is sufficiently factual to be susceptible of being proved true or false. Thus, the statement satisfies the first element of the two-part *Keohane* test.

■ However, we also conclude that the statements made, when viewed in the context of the postcard as a whole, cannot reasonably

be interpreted as stating actual facts about the plaintiff.

First, the postcard contains speculative and conjectural language ("If he will lie about a prayer – what else will he lie about?").

Second, like the editorial letters in *Keohane*, the postcard is replete with "imaginative expression" and "rhetorical hyperbole." Defendants expressed their views using capital letters, emphasized type, and exclamation points. The postcard also contains gross overgeneralization ("His latest remark in the Washington Post would put women's rights back in the dark ages," "consistently embarrassed himself," "perpetual candidate," "causes controversy wherever he speaks") and colorful, exaggerated terms ("Canned Kansas Prayer" and "bullied and physically threatened"). Hence, the overall tone of the postcard signals that the accusations contained in it should not be taken literally.

Perhaps most importantly, however, is the political context in which this postcard was presented. The Supreme Court and this court have recognized that allegations of defamation of political candidates and public officials must be considered against the backdrop of a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *Lane v. Arkansas Valley Publishing Co.*, 675 P.2d 747, 750 (Colo.App.1983). When a candidate for office enters the political arena, he "must expect that the debate will sometimes be rough and personal" and cannot "'cry Foul!' when an opponent ... attempts to demonstrate that he or she lacks 'sterling integrity.'" *Harte–Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 687, 109 S.Ct. 2678, 2695, 105 L.Ed.2d 562, 588 (1989).

 There is, of course, no wholesale privilege for defamatory statements made within a political context, and we do not suggest that reasonable people will always conclude that *every* statement made in the political arena is not an assertion of fact. Rather, we determine only that statements made in the midst of political debate must be considered within the usual and ordinary climate in which political candidates operate, which is "often composed of equal parts of

bombast, hyperbole, and billingsgate." *Desert Sun Publishing Co. v. Superior Court*, 97 Cal.App.3d 49, 53, 158 Cal.Rptr. 519, 522 (1979); *see also Perruccio v. Arseneault*, 7 Conn.App. 389, 508 A.2d 831 (1986) (while alleged defamatory statements made during labor or political controversies are not immunized from civil liability, they are gauged by the conventional give-and-take common to such disputes); *Lee v. Metropolitan Airport Commission*, 428 N.W.2d 815 (Minn.App. 1988) (political context or arena in which statement was made one of four factors considered in determining whether a statement is constitutionally protected); *Fletcher v. San Jose Mercury News*, 216 Cal.App.3d 172, 191, 264 Cal.Rptr. 699, 709 (1989)(in determining that statements made to newspaper accusing counsel member of unethical conduct were political rhetoric and hyperbole, court noted that "[o]ur political history reeks of unfair, intemperate, scurrilous and irresponsible charges against those seeking political office").

 Here, as with the letters in *Keohane v. Stewart, supra*, the postcard was presented through a traditional forum for debate, a political flyer. Under these circumstances, a reasonable person would realize that such communications are the type of critical commentary typically filled with political innuendo and should not be taken at face value or viewed as a statement of fact. *See also Desert Sun Publishing Co. v. Superior Court, supra* (letter printed in newspaper written by supporter of candidate for election to hospital board of directors which contained negative statements about opposing candidate distasteful but not actionable as part of the usual and ordinary kind of political rhetoric).

Accordingly, we conclude that the statements in the postcard cannot reasonably be interpreted as stating actual facts about an individual. Hence, we find that the statements are constitutionally privileged.

In light of the foregoing conclusions, reached without consideration of information outside plaintiff's complaint, we need not address plaintiff's remaining contentions.

The judgment is affirmed.

NEY, J., concurs.

QUINN, J.**, dissents.

**Justice QUINN dissenting.**

Because I view the statement that plaintiff "in the past bullied and physically threatened those who disagreed with him" as defamatory *per se* and not constitutionally protected, I dissent from the majority's affirmance of the summary judgment entered in favor of defendants.

I am in agreement with the majority's conclusion in Part I of the opinion that the only reasonable interpretation of the statement is that it imputes criminal conduct of an assaultive or harassing nature to plaintiff and, consequently, is defamatory *per se.* My disagreement is on the question whether the statement is constitutionally protected.

In resolving the constitutional question, the majority follows the supreme court's two-part analysis in *Keohane v. Stewart, supra,* and concludes that the statement is sufficiently factual to be susceptible of being proved true or false. With that conclusion, I agree. Where I part company with the majority is in its application of the second part of the *Keohane* analysis in determining whether a reasonable person would view the statement as one of fact.

The statements in *Keohane* consisted of two letters written to a local newspaper. The letters were written shortly after the plaintiff, who then was a district judge, found an anesthesiologist not guilty by reason of insanity on the charge of sexually assaulting an anesthetized 16–year–old patient. The letters did not refer to plaintiff by name but generally referred to collusion and payoffs between judges and doctors. The supreme court noted that the letters consisted of speculative commentary on matters of public concern and were replete with the sort of "imaginative expression" and "rhetorical hyperbole" regarded as worthy of constitutional protection. *Keohane v. Stewart, supra,* 882 P.2d at 1300. The court concluded that the statements, when considered in the social context of their utterance, could not reason-

ably be interpreted as a statement of fact about the plaintiff-judge.

In contrast to the statements in *Keohane,* the statement at issue here is clearly a recitation of facts about plaintiff and his past conduct. There is nothing speculative or conjectural about the assertion that plaintiff "in the past bullied and physically threatened those who disagreed with him." The words "bullied and physically threatened" were italicized so as to emphasize the underlying negative basis in fact for the writer's assessment of plaintiff's qualifications for public office.

The fact that the statement implies criminal conduct on the part of plaintiff should weigh heavily against consigning the statement to a constitutionally protected status. The additional fact that the defamatory statement was made by political activists in the context of a political campaign should not serve to create some form of constitutionally protected immunity for its makers. Finally, the fact that the postcard may have contained "imaginative expression" or "rhetorical hyperbole" with respect to other candidates does not somehow transform the defamatory factual statement about plaintiff into constitutionally acceptable debate on public issues.

Truth, of course, is a defense to a libel claim. That defense, however, should be a matter for the jury's determination. I would reverse the summary judgment in favor of defendants and would remand the case for a trial on the merits.

---

** Sitting by assignment of the Chief Justice under provisions of the Colo. Const. art. VI, Sec. 5(3), and §24–51–1105, C.R.S.1998.