COORS BREWING COMPANY,
Petitioner,

v.

David J. FLOYD, Respondent.

No. 97SC821.

Supreme Court of Colorado,
En Banc.

Jan. 11, 1999.

Hall & Evans, L.L.C., Daniel R. Satriana, Steven M. Gutierrez, Denver, Colorado, Attorneys for Petitioner

Cheryl Redmond Doyle, Denver, Colorado, Eugene F. Tardy, Lakewood, Colorado, Attorneys for Respondent

Arckey & Reha, L.L.C., Thomas J. Arckey, Jeffrey Menter, Littleton, Colorado, Sander N. Karp, Julie Berquist, Denver, Colorado, Attorneys for Amicus Curiae Plaintiff Employment Lawyers Association

Justice BENDER delivered the Opinion of the Court.

In this case, we decide whether the court of appeals correctly reversed the trial court's dismissal of two of David Floyd's tort claims against his former employer, the Coors Brewing Company (Coors). We hold that Floyd failed to state a claim for intentional infliction of emotional distress by outrageous conduct because Coors's alleged behavior does not rise to the high level of outrageous conduct required under our case law. We also hold that Floyd failed to state a claim for wrongful discharge in violation of public policy because he did not allege that he refused to participate in the illegal conduct. Therefore, on these two issues, we reverse the court of appeals decision, *Floyd v. Coors,* 952 P.2d 797 (Colo.App.1997), and we remand this case with instructions that the court of appeals return the case to the trial court for dismissal of these two claims.

## I. FACTS

Because this case concerns the adjudication of a motion to dismiss for failure to state a claim, our recitation of the facts is a distillation of the relevant allegations in Floyd's complaint. We emphasize that these "facts" are merely allegations and that by reciting them here, we make no assessment of their truthfulness. Indeed, for the purposes of this case, we are required to accept Floyd's allegations as true.

Floyd worked as an investigator in the Security Department at Coors from March 1977 until October 1992, when he was fired. Beginning in 1984, acting on instructions from senior executives at Coors, Floyd performed surreptitious narcotics investigations of Coors employees. Coors's in-house legal counsel consented to Floyd and other Coors employees undertaking these investigations.

In November 1987, Coors's outside legal counsel advised Coors not to participate in these investigations because of unwarranted legal risks, including the potential for civil rights litigation against Coors. Despite this advice, Coors conspired with its outside legal counsel to continue these investigations and to conceal Coors's involvement in them. Thus, Coors and its outside legal counsel devised a scheme to launder Coors funds to be used in the investigations by means of fraudulent billing for legal services through the law firm. Over the course of several years, some $266,000 was laundered through the law firm for the purposes of funding the investigations. The purpose of this laundering scheme was to circumvent Coors's internal policies and to conceal Coors's disbursement of funds for the investigations.

In November 1987, an attorney from the law firm advised Floyd that the "best" drug investigations for Coors to be involved with were those that could not be traced to Coors. This lawyer and a senior Coors executive directed Floyd to "bury" evidence of the drug investigations.

In August 1992, Coors executives met and planned Floyd's termination in order to protect themselves from liability for their orchestration of the drug investigations and related money-laundering scheme. That month, one of these executives, who was also Floyd's supervisor, ordered Floyd to provide an accounting for $288,000 worth of expenses related to investigations that had taken place over a period of seven years. Floyd and another Coors security officer spent an entire week reconstructing the seven years of expenses. The supervisor rejected the accounting provided without explanation.

In October 1992, senior Coors executives fired Floyd for these stated reasons: improprieties with a female employee, failure to account for company funds, and misuse of company funds. Floyd alleges that these reasons were pretextual and that the real reason Coors executives fired him was to cover up their own misconduct by making it appear that Floyd was solely responsible for the illegal investigations. Floyd claims that Coors's actions were intentional and that as a result he suffered substantial and serious emotional distress.

Assuming Floyd's factual allegations to be true, the trial court granted Coors's motion to dismiss for failure to state a claim with respect to Floyd's claim for intentional infliction of emotional distress by outrageous conduct and his claim for wrongful discharge in violation of public policy.

The court of appeals reversed both rulings. *See Floyd*, 952 P.2d at 804–05. The court of appeals held that the trial court's dismissal of Floyd's outrageous conduct claim was in error because reasonable people could disagree about whether the series of acts alleged by Floyd was outrageous. *See id.* at 804. Regarding the public policy claim, the court of appeals ruled that by claiming that his supervisors fired him in order to conceal their own illegal conduct, Floyd stated a cognizable claim for wrongful discharge in violation of public policy. *See id.* at 805.

We granted certiorari on the following issues: (1) whether the trial court erred in dismissing Floyd's fifth claim for relief for alleged outrageous conduct based upon the allegations of Floyd's complaint; and (2) whether the trial court erred in dismissing Floyd's sixth claim for relief for wrongful discharge in violation of public policy against Coors at the pleading stage.

## II. APPELLATE REVIEW OF A MOTION TO DISMISS UNDER RULE 12(b)(5)

Before addressing each of Floyd's claims, we briefly note that we accept the claims of the complaint as true and construe them in the light most favorable to Floyd.

The trial court granted Coors's motion to dismiss Floyd's claims under C.R.C.P. 12(b)(5). This rule is designed to allow defendants to "test the formal sufficiency of the complaint." *Dorman v. Petrol Aspen, Inc.*, 914 P.2d 909, 911 (Colo.1996). In evaluating a Rule 12(b)(5) motion, courts may consider "only those matters stated in the complaint." *Abts v. Board of Educ.*, 622 P.2d 518, 522 n. 5 (Colo.1980). A trial court must accept all allegations of material fact as true and view the allegations in the light most favorable to the plaintiff. *See Dorman*, 914 P.2d at 911. Such motions "are viewed with disfavor, and a complaint is not to be dismissed unless it appears beyond doubt that the plaintiff cannot prove facts in support of the claim that would entitle the plaintiff to relief." *Id.* When reviewing cases involving a trial court's ruling on a motion to dismiss pursuant to Rule 12(b)(5), we apply these same standards. *See id.*

## III. OUTRAGEOUS CONDUCT

In Colorado, to state a claim for intentional infliction of emotional distress by outrageous conduct, a plaintiff must allege behavior by a defendant that is extremely egregious. Here, we hold that Floyd fails to meet that high standard as a matter of law.

Before permitting a plaintiff to present a claim for outrageous conduct to the jury, the trial court must initially rule on the threshold issue of whether the plaintiff's allegations of outrageous conduct are sufficiently outrageous as a matter of law: "Although the question of whether conduct is outrageous is generally one of fact to be determined by a

jury, it is first the responsibility of a court to determine whether reasonable persons could differ on the question." *Culpepper v. Pearl St. Bldg., Inc.*, 877 P.2d 877, 883 (Colo.1994). Here, the trial court found that reasonable people could not differ on the question of whether Coors's alleged conduct was outrageous, but the court of appeals disagreed.

To begin our analysis of this issue, we turn to basic principles of law regarding the tort of intentional infliction of emotional distress by outrageous conduct. In *Rugg v. McCarty*, 173 Colo. 170, 176, 476 P.2d 753, 756 (1970), we approved the definition of this tort as set out in the Restatement (Second) of Torts § 46 (1965): "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." *Id.* We applied the Restatement's commentary to hold that the level of outrageousness required for conduct to create liability for intentional infliction of emotional distress is extremely high: "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.*

In *Cronk v. Intermountain Rural Elec. Ass'n*, 765 P.2d 619, 621 (Colo.App.1988), the Colorado Court of Appeals decided a case analogous to this one in which several plaintiffs alleged claims for outrageous conduct and for wrongful discharge in violation of public policy. In that case, one plaintiff alleged that he was fired because he asked for a transfer since he could not support the policies of his supervisor, who was directing him to engage in illegal practices, while another plaintiff alleged that he was fired for giving truthful testimony to the Public Utilities Commission during their investigation of these illegal practices. *See id.* The court of appeals held that even though the plaintiffs' wrongful discharge claims were sufficient to survive summary judgment, as a matter of law, the plaintiffs' allegations did not meet the high standard for outrageous conduct

claims that we established in *Rugg v. McCarty. See id.* at 622, 624.

▉ Applying this high standard here, we hold that the conduct Floyd alleges is insufficient to state a claim for intentional infliction of emotional distress by outrageous conduct. For the purposes of this appeal, we accept as true Floyd's allegations that Coors engaged in an extensive criminal conspiracy involving illegal drugs and money laundering and that Coors fired Floyd to scapegoat him for these crimes. However, we find that the outrageousness of Coors's alleged criminal conduct towards society – conduct that Floyd participated in—is irrelevant to Floyd's claim as an individual tort plaintiff seeking to sue Coors. To assess Floyd's tort claim, we focus on Coors's behavior toward Floyd and whether it was "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Rugg*, 173 Colo. at 176, 476 P.2d at 756. As a matter of law, we hold that Floyd's allegations fail to meet this exacting standard. Because no reasonable person could find that Coors's alleged scapegoating of Floyd arose to the high level of outrageousness required by our case law, the court of appeals erred in reversing the trial court's dismissal of this claim.

## IV. WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY

Turning to the wrongful discharge claim, we hold that Floyd's complaint fails to allege facts that would create a public policy justification entitling him to keep his job.

▉ Under common law, either an employer or an employee can terminate an at-will employment relationship without incurring legal liability for this termination. See *Martin Marietta Corp. v. Lorenz*, 823 P.2d 100, 104–05 (Colo.1992). In *Martin Marietta Corp. v. Lorenz*, we first recognized the public policy exception to an employer's right to fire an employee. *See id.* at 108. As a general matter, the public policy exception allows at-will employees to pursue claims for wrongful discharge if they allege that they were discharged because they either (1) re-

fused to engage in conduct that would violate public policy, or (2) engaged in conduct that is protected or encouraged as a matter of public policy. In *Lorenz*, the employee, Lorenz, alleged that he had been discharged because of his refusal to obey his employer's order to write a report attesting to the suitability of some materials for space vehicles for the National Aeronautics and Space Administration (NASA). *See id.* at 102–03. In Lorenz's professional judgment as a mechanical engineer, the materials in question had not been subjected to adequate testing, and therefore writing such a report would have constituted a fraud on NASA. *See id.* Thus, in *Lorenz*, we recognized the public policy exception to the at-will employment doctrine, reasoning that an employee "should not be put to the choice of either obeying an employer's order to violate the law or losing his or her job." *Id.* at 109.

Interpreting *Lorenz* more recently, we held that a claim for wrongful discharge under the public policy exception must contain the following elements:

> (1) the employer directed the employee to perform an illegal act as part of the employee's work related duties; (2) the action directed by the employer would violate a statute or clearly expressed public policy; (3) *the employee was terminated as a result of refusing to perform the illegal act;* and (4) the employer was aware or should have been aware that the employee's refusal was based upon the employee's reasonable belief that the act was illegal.

*Rocky Mountain Hosp. & Med. Serv. v. Mariani,* 916 P.2d 519, 527 (Colo.1996) (emphasis added).[1]

Floyd asks us to expand the public policy exception beyond *Lorenz* and *Mariani* to include situations in which an employee performs the illegal act required by his or her employer and then the employer fires the employee to cover up the employer's complicity in the crime. We decline to do so. Such an expansion of the public policy exception is not warranted. The public policy exception protects an employee from being forced to choose between committing a crime and losing his or her job.[2] If an employee commits a series of crimes and only points the finger at his employer *after* he has been fired, then there is no public policy rationale that supports the expansion of the exception to the general rule that an employer may discharge an at-will employee without liability.[3] An at-will employee who participates in a criminal enterprise and does nothing to blow the whistle on this criminal enterprise does not gain special protection from discharge simply because the employer was also a complicitor in the crimes committed.

Here, Floyd makes no allegation that at any time he refused to engage in the illegal acts that his supervisors allegedly directed him to do. On the contrary, he admits participating in the illegal undercover operations for at least seven years. During this long period of time, according to Floyd's version of events, not once did he express an unwillingness to follow his superiors' instructions, refuse to participate in the illegal investigations, or blow the whistle on this alleged criminal enterprise. Viewing Floyd's factual allegations in the light most favorable to him,

---

**1.** In that case, we held that Mariani had established a prima facie case of wrongful discharge in violation of public policy where she alleged that her employer fired her because she refused to engage in unethical accounting practices.

**2.** Of course, we recognized in *Lorenz* that the public policy exception is cognizable not only for an employer who retaliates against an employee for refusing to engage in illegal conduct but also one who retaliates against an employee for performing an important public obligation or exercising a statutory right or privilege. *See Lorenz,* 823 P.2d at 109. The purpose of the public policy exception in these instances is to ensure that in order to keep his or her job, an employee is not required to forsake an important public

duty (such as whistle-blowing) or to forgo a job-related right or privilege. *See id.* Floyd's allegations do not implicate these issues.

**3.** We respectfully disagree with the court of appeals' reasoning that "[d]eterring employers from concealing their illegal conduct by discharging an employee relates to a substantial public interest that affects society as a whole." *Floyd,* 952 P.2d at 805. The public policy exception to the at-will employment doctrine is designed to avoid a situation whereby the deterrence value of the threat of a criminal sanction is undermined by the countervailing threat that a refusal to break the law will cause the employee to lose his or her job.

we hold that Floyd's complaint fails to state a claim for wrongful discharge under the public policy exception.

### V. CONCLUSION

In conclusion, we reverse the court of appeals decision with respect to these two issues only, and we remand the case with instructions that it be returned to the trial court for dismissal of Floyd's claim for intentional infliction of emotional distress by outrageous conduct and Floyd's claim for wrongful discharge in violation of public policy.