**H.G. WESTERMAN, Carl A. Westerman, and Loyle P. Miller, Plaintiffs–Appellees,**

**v.**

**James P. ROGERS, Desmond D. Brophy, Joseph P. Brophy, Jr., Joseph P. Brophy, Douglas K. Brophy, James P. Brophy, James P. Brophy, III, Alice Snelling, Donald R. Brophy, and Martin D. Brophy, Defendants–Appellants.**

**No. 98CA0400.**

Colorado Court of Appeals, Div. V.

Aug. 5, 1999.

Rehearing Denied Nov. 26, 1999.

Certiorari Denied May 22, 2000.

McGloin, Davenport, Severson & Snow, Gary C. Davenport, Denver, Colorado, for Plaintiffs–Appellees H.G. Westerman, Loyle P. Miller and Carl A. Westerman.

Miller & Lehman, P.C., David A. Miller, Susan Rampacek, Dallas, Texas, for Plaintiffs–Appellees H.G. Westerman and Loyle P. Miller.

Rasmussen, Barton, & Willis, LLC., George A. Barton, Kansas City, Missouri; Charles Carpenter, Denver, Colorado, for Defendants–Appellants.

Opinion by Judge ROTHENBERG.

Defendants, James P. Rogers, Desmond D. Brophy, Joseph P. Brophy, Jr., Joseph P. Brophy, Douglas K. Brophy, James P. Brophy, James P. Brophy, III, Alice Snelling, Donald R. Brophy, and Martin D. Brophy, (collectively Royalty Owners) appeal the summary judgment entered in favor of plaintiffs, H.G. Westerman, Carl A. Westerman, and Loyle P. Miller, (collectively Westerman Producers), the court's denial of their cross-motion for summary judgment, and its denial of their motion to re-open discovery. Because we conclude there are genuine issues of material fact to be resolved, we reverse and remand for further proceedings.

Royalty Owners own certain interests pursuant to various lease agreements and over-riding agreements (leases) which entitle them to royalty payments from the production and sale of natural gas. Royalty Owners initially entered into these leases with a purchaser of natural gas, Kansas Nebraska Natural Gas Company, Inc. (K–N).

In 1976, Westerman Producers entered into an arrangement with K–N to produce gas from leaseholds held by K–N in Yuma County, Colorado. As a result of these agreements between Westerman Producers and K–N, the lessee's rights and obligations under the leases were assigned to Westerman Producers.

In 1977, Westerman Producers and K–N also entered into contracts for the purchase of gas produced from these leaseholds. A dispute later arose between K–N and Westerman Producers over the extent of K–N's obligations under those contracts. Following litigation, the parties entered into a stipulation to dismiss the litigation and to amend the purchase contracts (the 1988 amended contracts).

The 1988 amended contracts, which replaced the 1977 gas purchase contracts, resulted in Westerman Producers receiving a lower price for gas for the first five years with the price to be redetermined by agreement or by arbitration every two years beginning in 1993. In 1993, when the parties were unable to reach an agreement on the increased price, they proceeded to arbitration.

Following arbitration, Westerman Producers filed an action against K–N for breach of the contract amendments and for alleged tortious conduct. The parties again entered into a negotiated settlement which resulted in a lump sum payment to Westerman Producers of $8,225,000 to settle all claims and terminate the contracts.

After that settlement, Westerman Producers paid royalties to Royalty Owners for that portion of the settlement Westerman Producers attributed to K–N's deficiencies on payments for gas produced prior to the settlement. According to Westerman Producers, the total proceeds purportedly subject to royalty payments approximated $186,000, or under three percent of the total settlement.

Royalty Owners demanded royalty payments on the entire settlement amount, and Westerman Producers responded by filing this declaratory action to determine the rights of the parties under the leases.

Thereafter, both sides submitted cross-motions for summary judgment asserting that there were no genuine issues of material fact and that they were entitled to judgment. Based on the submissions, the trial court determined that Royalty Owners were entitled to royalty payments only on approximately $186,000, as Westerman Producers had maintained, and the court entered judgment in favor of Westerman Producers. It denied Royalty Owners' cross-motion for summary judgment and further denied Royalty Owners' motion to re-open discovery.

## I.

### Denial of Summary Judgment Not Appealable

■ Royalty Owners first contend the trial court erred in denying their cross-motion for summary judgment. However, that ruling is not appealable. *See Feiger, Collison & Killmer v. Jones,* 926 P.2d 1244 (Colo.1996) (denial of a motion for summary judgment is not a final appealable order).

## II.

### Granting of Summary Judgment Erroneous

Royalty Owners next contend the trial court erred in granting summary judgment in favor of Westerman Producers in which it limited them to royalty payments only on the portion of the settlement related to the past production of gas. Because we conclude there are genuine issues of material fact to be resolved, we agree that summary judgment should not have been granted and that remand for further proceedings is required.

### A.

### Standard of Review

Summary judgment should be granted only if there is no genuine issue as to any material fact, and the burden to so demon-strate is on the moving party. Appellate review of a summary judgment is *de novo. Aspen Wilderness Workshop, Inc. v. Colorado Water Conservation Board,* 901 P.2d 1251 (Colo.1995).

A court must consider the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, in determining whether to grant a motion for summary judgment. C.R.C.P. 56(c). The nonmoving party is entitled to the benefit of all favorable inferences that may reasonably be drawn from the undisputed facts. *Aspen Wilderness Workshop, Inc. v. Colorado Water Conservation Board, supra.*

Once the moving party makes a convincing showing that there are no genuine issues of material fact, the opposing party must demonstrate with relevant and specific facts that a real controversy exists. The opposing party may not rest upon mere allegations or denials in its pleadings, but must provide specific facts demonstrating the existence of a genuine issue for trial. *Sender v. Powell,* 902 P.2d 947 (Colo.App.1995).

### B.

### The Trial Court's Ruling

Here, the leases at issue are "production"-type leases which obligate Westerman Producers to pay Royalty Owners royalties only for gas "produced, saved and sold" or gas "produced and sold." The term, "produced," was not defined in the leases or by any applicable statutory provision, but the trial court afforded it its common meaning when used in this context.

The court stated in its order that "[t]he meaning of the term 'production,' when used in a royalty or habendum clause of an oil and gas lease, requires severance of the mineral from the ground."

In its complaint, Westerman Producers asserted that the proceeds from the settlement between them and K–N were allocated as follows:

a. $2,538,559.04 for legal expenses incurred in connection with litigation and arbitration;

b. $185,679.31 for claims arising from past production of gas (past production proceeds);

c. $3,262,430.35 for tort claims; and

d. $2,238,331.30 to terminate the contracts at issue.

In Westerman Producers' motion for summary judgment, they maintained that Royalty Owners were entitled to royalty payments only on the portion of the settlement proceeds attributable to past production proceeds. In support of their motion, Westerman Producers submitted the following documents: the settlement agreement with K–N; several of the lease agreements at issue here; an affidavit executed by H.G. Westerman; an affidavit executed by Suzanne Sanders, the custodian of records for J–W Operating Company (J–W), a representative of Westerman Producers and operator of the majority of wells covered by the leases; and an unverified letter from J–W to one of the Royalty Owners setting forth the allocation of the proceeds as described above and in the complaint.

Royalty Owners did not submit their own affidavits, but challenged the validity of the allocation of proceeds and the manner in which the proceeds should be distributed.

Based on those submissions, the trial court concluded that: (1) royalty payments are not due under a production-type lease unless and until gas is physically extracted from the ground; (2) no royalty payments were owed on the settlement proceeds unless the proceeds serve as compensation for the production of gas; and (3) based on the court's construction of the term "production," Westerman Producers had paid to Royalty Owners a royalty or overriding royalty interest share of that portion of the settlement related to the production claims.

■ We conclude that summary judgment was erroneously granted for two reasons. First, our review of the evidence convinces us that a genuine issue of material fact remains regarding the propriety of Westerman Producers' unilateral allocation of the settlement proceeds. Secondly, as described below, we conclude that the trial court did not apply the correct legal standard in its analysis of the issue.

Although Westerman Producers supported their motion with certain affidavits and other documents and Royalty Owners did not, nevertheless, the documents themselves create a genuine issue of material fact.

Westerman's own affidavit contains his view of what the legal standard should be in construing the leases, and does not contain any facts of significance supporting the allocation of proceeds. Nor does the affidavit of Sanders support the allocation, except for the amount allocated to past production of gas, which is undisputed and constitutes under three per cent of the total settlement. And, as previously noted, the letter purporting to contain the allocation was unverified and does not comply with C.R.C.P. 56. It also is conclusory and contains no explanation for the allocation.

Further, under the terms of the settlement agreement, a copy of which accompanied the motion for summary judgment, the parties did not apportion the proceeds. In fact, the agreement contradicts Westerman Producers' allocation of approximately 31% of the settlement or $2,538,559.04 for legal expenses. The agreement expressly provides that "each party [is] to bear its own costs, expenses, and attorneys fees of whatever nature."

Similarly, while Westerman Producers claims that almost 40% of the settlement or $3,262,430.35 should be allocated for tort claims which are not royalty bearing, the settlement agreement is silent with regard to any such specific allocation.

Accordingly, while it would have been preferable for Royalty Owners to respond with their own affidavits or other evidence contesting the allocation of proceeds by Westerman Producers, *see Ginter v. Palmer & Co.,* 196 Colo. 203, 585 P.2d 583 (1978), nevertheless, Royalty Owners are entitled to the benefit of all favorable inferences that may reasonably be drawn from the undisputed facts. Based on that standard, we conclude a genuine issue of fact exists regarding whether the Royalty Owners were in fact paid all the royalties to which they were legally entitled.

*See Aspen Wilderness Workshop, Inc. v. Colorado Water Conservation Board, supra.*

## III.

### Nature of Settlement Proceeds

We also conclude that the trial court failed to apply the correct legal standard in its analysis. In so concluding, however, we acknowledge that the trial court had little guidance at the time of its ruling because Colorado appellate decisions have not determined whether settlement proceeds from a buy-out or termination of production contracts, and take-or-pay provisions therein, are royalty bearing.

Given the absence of Colorado authority, we look to other jurisdictions that have addressed the issue.

### A.

### Cooperative Venture Analysis

A few jurisdictions have applied a "cooperative venture" analysis which does not strictly construe mineral leases, but instead views them more as a statement of the general expectations of both parties. Under this theory, royalty holders share proportionately in the benefits of mineral development even though such benefits are not necessarily tied solely to production. *See Klein v. Jones,* 980 F.2d 521 (8th Cir.1992)(oil and gas lease is a "cooperative venture" in which lessor contributes the land and lessee the capital and experience to develop minerals for the benefit of both parties); *Frey v. Amoco Production Co.,* 603 So.2d 166 (La.1992); Lowe, *Defining the Royalty Obligation,* 49 SMU L.Rev. 223 (1996). *But see Harvey E. Yates Co. v. Powell,* 98 F.3d 1222 (10th Cir.1996)(discussing cooperative venture theory, and concluding that Oklahoma courts would reject it).

### B.

### Plain Term or Plain Meaning Analysis

A larger number of jurisdictions, however, strictly interpret royalty clauses in mineral leases and have held that no royalty payments are due when there is no actual production. The decisions in these so-called "plain term" or "plain meaning" jurisdictions have turned on the definition of "production" in mineral leases.

These jurisdictions have defined production in this context to mean the actual and physical extraction of the minerals. *See Diamond Shamrock Exploration Co. v. Hodel,* 853 F.2d 1159 (5th Cir.1988)("production" as used in the context of calculating royalty payments requires actual physical severance of minerals); *Roye Realty & Developing, Inc. v. Watson,* 949 P.2d 1208 (Okla.1996)("produced" means not only discovery of the product, but also extraction from the ground); *Killam Oil Co. v. Bruni,* 806 S.W.2d 264 (Tex.App.1991)(defined "production" as actual physical extraction of the mineral from the soil); *State v. Pennzoil Co.,* 752 P.2d 975 (Wyo.1988)("production" requires severance of the minerals from the ground).

Hence, where leases condition royalty payments on the production of minerals, these jurisdictions have construed the leases literally and have held that royalty interests are not triggered unless actual production occurs. *See Harvey E. Yates Co. v. Powell, supra* (royalty payments are not due under a "production"-type lease unless and until gas is physically extracted); *Diamond Shamrock Exploration Co. v. Hodel, supra,* 853 F.2d at 1168 ("For purposes of royalty calculation and payment, production does not occur until the minerals are physically severed from the earth."); *State v. Pennzoil Co., supra* (without production and sale of gas, payment of royalties not required). *See also* 8 H. William & C. Meyers, *Oil & Gas Law* 851 (1997)("production"-type lease is oil and gas lease which requires physical severance from the ground before royalty obligation is triggered).

Generally, these "plain term" or "plain meaning" jurisdictions have held that royalty payments are not required in the following three circumstances: (1) take-or-pay payments (payments made in lieu of taking minimum requirements under contract); (2) buy-out payments (payments to terminate future take-or-pay obligations in purchase contract); and (3) buy-down payments (lump sum pay-

ments in consideration for renegotiation of purchase contract to reduce future purchase price). Royalty payments are not required because these payments are not for production of minerals. *See Diamond Shamrock Exploration Co. v. Hodel, supra* (take-or-pay payments are payment for the purchaser's failure to take gas and are intended to compensate primarily the producer, not the owner of the minerals, for the risks associated with the development of production); *Roye Realty & Developing, Inc. v. Watson, supra* (under Oklahoma law, royalty owner is not entitled to share in take-or-pay settlements absent clear language to the contrary); *Killam Oil Co. v. Bruni, supra,* 806 S.W.2d at 268 (take-or-pay payments do not constitute any part of the price paid for produced gas, nor do they have the effect of increasing the price paid for the gas; "payments are made when gas is not produced, and as such, bear no royalty.").

## C.

### *Tenth Circuit Approach*

In two recent cases, the Tenth Circuit has expanded the definition of production. In *Harvey E. Yates Co. v. Powell, supra,* 98 F.3d at 1231, the panel, applying New Mexico law, adopted three guiding principles in determining whether settlement proceeds are royalty bearing stating:

First, royalty payments are not due under a production-type lease unless and until gas is physically extracted from the leased premises. Second, nonrecoupable proceeds received by a lessee in settlement of the take-or-pay provision of a gas supply contract are specifically for non-production and thus are not royalty bearing. Third, any portion of a settlement payment that is a buy-down of the contract price for gas that is actually produced and taken by the settling purchaser is subject to the lessor's royalty interest at the time of such production, but only in an amount reflecting a fair apportionment of the price adjustment payment over the purchases affected by such price adjustment.

Later, in *Watts v. Atlantic Richfield Co.,* 115 F.3d 785 (10th Cir.1997), another division of the court, applying Oklahoma law, reaffirmed *Yates* and expanded it. The *Watts* court concluded that take-or-pay settlements and buy-down payments should be considered additional proceeds for gas that has already been produced because these provisions lower the price paid for future obligations and effectively reduce the amount of future royalties due.

Specifically, the *Watts* court concluded that royalty interests extend to any settlement or payment in which a producer receives consideration for compromising its pricing claim, but only to the extent that the claim relates to either past or future production actually taken by the settling purchaser. *See Watts v. Atlantic Richfield Co., supra.*

■ After consideration of these differing lines of authority, we are persuaded by and adopt the analyses of *Yates* and *Watts.* Thus, we similarly conclude that royalty interests extend to any settlement or payment in which a producer receives consideration for compromising its pricing claim, but only to the extent that the claim relates either to past or future production actually taken by the settling purchaser.

Here, although both sides also rely on *Yates* and *Watts* in support of their respective positions, neither those cases nor any of the other cases discussed earlier were considered by or cited in the trial court's order. The court strictly defined the term, "production," and concluded that because royalties were tied to production, the Royalty Owners had been fully paid.

But, as both panels of the Tenth Circuit noted in reversing summary judgments, that does not end the inquiry. The trial court also must determine the proper allocation of proceeds, and whether any of those proceeds are subject to royalties under the principles set forth in both *Yates* and *Watts.*

■ Accordingly, we conclude that there exists a genuine issue of material fact whether the proceeds from the settlement between Westerman Producers and K–N are attributable solely to non-production or whether they are attributable entirely or in part to a price adjustment for the actual production of gas.

## IV.

### *Implied Covenant to Market*

Royalty Owners also contend they are entitled to royalty proceeds because Westerman Producers breached the implied covenant to market. Westerman Producers agree that this is a viable claim in Colorado, but they correctly note that Royalty Owners did not affirmatively plead this claim as a counterclaim, or raise it directly in their answer. *See Davis v. Cramer,* 808 P.2d 358 (Colo.1991)(recognizing implied covenant to market claim filed by party); *Watts v. Atlantic Richfield Co., supra* (holding that, under Oklahoma law, there existed an implied covenant to market which had been pled by party).

Rather, the issue whether Westerman Producers had breached the implied covenant to market thereby entitling Royalty Owners to royalty payments, was first raised by argument in Royalty Owners' brief in opposition to Westerman Producers' motion for summary judgment.

Nevertheless, because we have concluded that summary judgment should not have been entered and that remand is required, Royalty Owners may move to amend their answer to include this counterclaim. *See Super Valu Stores, Inc. v. District Court,* 906 P.2d 72 (Colo.1995)(trial courts may permit parties to amend pleadings in proceedings conducted subsequent to entry of an appellate court's order of remand). Given our conclusion that remand is required, the trial court, in its discretion, should allow further discovery.

The judgment is reversed and the cause is remanded to the trial court for further proceedings consistent with the views expressed in this opinion.

Judge CASEBOLT and Judge TAUBMAN concur.