Peter T. TONNESSEN, Plaintiff–Appellant,

v.

The DENVER PUBLISHING COMPANY, a/k/a Denver Publishing Co., a Colorado Business Corporation, d/b/a The Rocky Mountain News, Defendant–Appellee.

No. 98CA1583.

Colorado Court of Appeals, Div. V.

June 22, 2000.

Peter T. Tonnessen, Pro Se.

Baker & Hostetler, LLP., Marc D. Flink, Jeanne A. Carroll, Denver, Colorado, for Defendant–Appellee.

Opinion by Judge ROTHENBERG.

Plaintiff, Peter T. Tonnessen, appeals the summary judgment in favor of defendant, Denver Publishing Co., dismissing his claims for defamation, invasion of privacy, and outrageous conduct. We affirm.

On June 11, 1995, Denver Publishing printed an article about Tonnessen's dissolution of marriage action in the *Rocky Mountain News*. The article focused on the unusual circumstances surrounding the impregnation of Tonnessen's ex-wife, who had recently given birth to twin girls fathered by different men.

The twins were conceived in January 1994, after the wife had filed the dissolution action but before she finally left the marital home. After Tonnessen discovered that his wife was pregnant, he filed a paternity action, and test results showed that Tonnessen was the father of one of the twins, but the other had been fathered by the wife's boyfriend. The case attracted considerable media attention around the world.

During the dissolution proceedings, the wife explained the dual impregnation by testifying that she had had consensual sex with her boyfriend, who by the time of the dissolution was her fiancé and is now her husband, and that some time afterwards she had been raped by Tonnessen in the marital home. Tonnessen denied raping his wife.

The article in the *Rocky Mountain News* repeated the wife's allegation of marital rape and Tonnessen's denial, and also included several other statements about Tonnessen which he alleges accuse him of stalking, spousal abuse, and violating the dissolution court's gag order. On July 16, 1995, Denver Publishing printed a follow-up article that repeated both sides of the rape allegation.

Following the publication, Tonnessen filed this action seeking damages for defamation, invasion of privacy, and outrageous conduct. Denver Publishing moved to dismiss the action for failure to state a claim under C.R.C.P. 12(b)(5). The trial court denied the motion, but ordered Tonnessen to file an amended complaint specifying the allegedly defamatory statements.

Tonnessen then filed an amended complaint, and Denver Publishing filed a renewed motion to dismiss, or in the alternative, a motion for summary judgment under C.R.C.P. 56.

The trial court granted the motion for summary judgment based on the pleadings

and on certain articles that were attached. After examining the submissions, the court determined as a matter of law that: (1) the statements were not defamatory; (2) they were privileged; (3) the facts published were already in the public domain; and (4) Denver Publishing's conduct did not support a claim for relief for outrageous conduct.

## I. Defamation

Tonnessen first contends the trial court erred in determining that the statements were not defamatory or, to the extent they were defamatory, that they were privileged. We disagree.

Because Denver Publishing attached exhibits to its motion to dismiss and Tonnessen also tendered an exhibit, the trial court properly treated the motion as one for summary judgment. *See* C.R.C.P. 12(b); *Churchey v. Adolph Coors Co.*, 759 P.2d 1336 (Colo.1988).

■ Summary judgment is particularly appropriate in defamation actions because the threat of protracted litigation could have a chilling effect upon constitutionally protected rights of free speech. *Lockett v. Garrett*, 1 P.3d 206 (Colo. 1999). Nevertheless, summary judgment may be granted only if there is no genuine issue as to any material fact, and the burden so to demonstrate is on the moving party.

■ Appellate review of a summary judgment is *de novo*. *Westerman v. Rogers*, 1 P.3d 228 (Colo. 1999).

■ Defamation is a communication that holds an individual up to contempt or ridicule, thereby causing him or her to incur injury or damage. *Keohane v. Stewart*, 882 P.2d 1293 (Colo.1994); *Lockett v. Garrett, supra*. At common law, the tort of defamation existed to redress and compensate individuals who suffered serious harm to their reputations because of the careless or malicious communications of others. *Keohane v. Stewart, supra; Smiley's Too, Inc. v. Denver Post Corp.*, 935 P.2d 39 (Colo.App.1996).

■ To be defamatory, a statement need only prejudice the plaintiff in the eyes of a substantial and respectable minority of the community. *Arrington v. Palmer*, 971

P.2d 669 (Colo.App.1998). A finding that the language used was actually defamatory must be predicated on the context of the entire story and the common meaning of the words used. *Burns v. McGraw–Hill Broadcasting Co.*, 659 P.2d 1351 (Colo.1983).

■ A statement may be considered defamatory *per se* if it is specifically directed at the person claiming injury and if, on its face and without extrinsic proof, it is unmistakably recognized as injurious. A statement imputing a criminal offense is defamatory *per se*. *Arrington v. Palmer, supra*.

■ Whether a statement is defamatory *per se* presents an issue for the court to determine. *Walker v. Associated Press*, 160 Colo. 361, 417 P.2d 486 (1966). To make that determination, the court must examine the statement itself without the aid of inducements, colloquialisms, innuendoes, or explanatory circumstances. *Arrington v. Palmer, supra*.

Applying those principles here, we agree with the trial court that most of the statements relied upon by Tonnessen in his complaint were not defamatory as a matter of law and that the other statements, while defamatory, are not actionable. We take the statements in turn.

### A.

■ Tonnessen contends the first article imputed to him the crime of stalking by stating that, before the couple were married, he would show up everywhere the wife went and even followed her to Maine. However, we conclude that the statements, at most, portrayed him as a persistent suitor, not as a stalker. *See* § 18–9–111, C.R.S.1999.

### B.

■ We also reject Tonnessen's contention that the first article portrayed him as an abusive husband through statements that he "looked down" on his wife and belittled her. While these statements may have portrayed him in a bad light, we agree with the trial court that they did not constitute defamation. *See Burns v. McGraw–Hill Broadcasting Co., supra*.

### C.

■ We also reject Tonnessen's assertion that one of the articles portrayed him as the person who notified or "tipped" the media about the case, thus casting him in an unfavorable light.

The specific statement to which he objects is as follows:

The case continued in relative obscurity until four weeks ago, when someone tipped a Colorado Springs television station. After the story aired, reporters from all over the country called the attorneys.

[The judge] issued his gag order—15 minutes after [Tonnessen] gave an interview to [a reporter] of KOAA–TV in Colorado Springs.

In our view, only an extraordinarily strained interpretation of these statements would lead to the conclusion that Tonnessen was the "someone" who notified the media. Nevertheless, to the extent that such a conclusion could be drawn, we agree with the trial court that the above-quoted statement was not defamatory.

### D.

Tonnessen's next contention is that the trial court erred in granting summary judgment because the articles quoted statements by his wife and her sister which falsely portrayed him as a rapist. We conclude summary judgment was properly granted.

■ The imputation of rape is defamatory *per se*. *See Arrington v. Palmer, supra.* However, under the common law doctrine of fair report, reports of in-court proceedings containing defamatory material are privileged if they are fair and substantially correct, or are substantially accurate accounts of what took place. *See Rosenberg v. Helinski*, 328 Md. 664, 616 A.2d 866 (1992); *Cianci v. New Times Publishing Co.*, 639 F.2d 54 (2d Cir.1980)(recognizing common law privilege of fair report of public court trials as far back as 1796).

■ The privilege exists even if the reporter of the defamatory statements believes or knows them to be false. *Rosenberg v. Helinski, supra.*

■ The wife's accusation of rape was made in open court, and therefore, it is irrelevant as a matter of law whether the allegation was false. It is also undisputed that Denver Publishing's reports accurately described the wife's in-court accusation, followed by Tonnessen's denial of the charges in the article. Accordingly, the reports of the wife's in-court accusation were privileged. *See Rosenberg v. Helinski, supra.*

■ Nor are we persuaded by Tonnessen's assertion that the newspaper is liable based on the publication of two alleged defamatory statements that were made out of court by the wife's sister. The first reported statement attributed to the sister, to which Tonnessen objects, was not defamatory as a matter of law. The statement was that Tonnessen had told the sister "he had sex with [the wife] that night because he 'was so overcome with her sensitivity.' "

Tonnessen concedes in his complaint that he had sex with his wife, and the statement does not amount to a confession of rape. Hence, we conclude the statement was not defamatory.

■ The second statement attributed to the sister was that the wife said Tonnessen had "forced [wife] to the floor and had sex with her," which is in essence a repetition of the wife's accusation of rape. However, even if that statement about Tonnessen was false, we conclude it was not actionable.

The fair report privilege is not limited to media defendants, but extends to protect reports of judicial proceedings made by all other persons as well. *See Rosenberg v. Helinski, supra.* Thus, to the extent the sister was simply repeating the wife's in-court accusation, the sister's statement also was privileged.

■ Tonnessen maintains that the fair report privilege does not apply to the sister's statement because she was not present in the courtroom when the wife made her accusation, and that therefore, the sister was not reporting an in-court statement. Even if we assume this interpretation of the privilege is correct, we would reach the same conclusion.

This statement by the sister is virtually the same as the wife's in-court accusation which was reported by Denver Publishing. Because we have held that the reporting of the wife's statement is protected by the fair report privilege, we conclude the sister's statement is not actionable under the "incremental harm doctrine."

■ Under the incremental harm doctrine, when unchallenged or nonactionable parts of a particular publication are damaging, another statement, though maliciously false, may not be actionable because it causes no harm beyond the harm caused by the remainder of the publication. *See Masson v. New Yorker Magazine,* 501 U.S. 496, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991); *Simmons Ford, Inc. v. Consumers Union of U.S., Inc.,* 516 F.Supp. 742, 750 (S.D.N.Y. 1981) ("Given the abysmal performance and safety evaluations detailed in the article, plaintiffs could not expect to gain more than nominal damages based on the addition to the article of the misstatement relating to federal safety standards.").

■ The incremental harm doctrine "measures the incremental harm inflicted by the challenged statements beyond the harm imposed by the rest of the publication. If that harm is determined to be nominal or nonexistent, the statements are dismissed as not actionable." *Herbert v. Lando,* 781 F.2d 298 (2d Cir.), *cert. denied,* 476 U.S. 1182, 106 S.Ct. 2916, 91 L.Ed.2d 545 (1986); *Jewell v. NYP Holdings, Inc.,* 23 F.Supp.2d 348, 388 (S.D.N.Y.1998)(under this doctrine, the court "compares the harm caused by non-actionable elements of an article to the harm caused by actionable portions and dismisses the latter when the difference is incremental").

Thus, in *Herbert v. Lando, supra,* 781 F.2d at 312, after determining that defendants were entitled to summary judgment with respect to nine of eleven alleged defamatory statements, the court dismissed the claims as to the remaining two statements because they conveyed "the same view" and were "simply an outgrowth of and subsidiary to" the ideas conveyed in the nine dismissed statements.

Although the United States Supreme Court has rejected the idea that the incremental harm doctrine is constitutionally required under the First Amendment, it expressly recognized that state courts are free to adopt the doctrine as a matter of state tort law. *See Masson v. New Yorker Magazine, Inc., supra.*

A few jurisdictions have now addressed the incremental harm doctrine. The Second Circuit has adopted it, *see Herbert v. Lando, supra,* and a federal district court in New York has concluded that New York would adopt it. *See Jewell v. NYP Holdings, Inc., supra,* 23 F.Supp.2d at 387–94.

Wisconsin has rejected it, *see Maguire v. Journal Sentinel, Inc.,* 232 Wis.2d 236, 248, 605 N.W.2d 881, 888 (Wis.App.1999)("The doctrine of incremental harm ... goes to the question of whether a false statement damaged the plaintiff's reputation in light of the whole truth about other acts of the plaintiff"), as has the D.C. Circuit. *See Liberty Lobby, Inc. v. Anderson,* 746 F.2d 1563 (D.C.Cir. 1984). The Ninth Circuit has concluded it has not been adopted under applicable state law. *See Masson v. New Yorker Magazine, Inc.,* 960 F.2d 896 (9th Cir.1992).

■ The jurisdictions that have rejected the incremental harm doctrine have sometimes intertwined the doctrine with the "substantial truth doctrine," and the "libel-proof plaintiff" doctrine, which precludes a plaintiff's recovery for libel if his or her reputation up to the time of the challenged publication has been "irreparably strained by prior publications." *Liberty Lobby, Inc. v. Anderson, supra,* 746 F.2d at 1568. *See* Kite, *Incremental Identities: Libel–Proof Plaintiffs, Substantial Truth, and the Future of the Incremental Harm Doctrine,* 73 N.Y.U. L.Rev. 529 (1998); Note, *The Libel–Proof Plaintiff Doctrine,* 98 Harv. L.Rev. 1909 (1985).

The libel-proof plaintiff doctrine has been criticized because the fact that an individual has done one bad thing does not necessarily mean the individual has done another entirely separate bad act. *See Liberty Lobby, Inc. v. Anderson, supra,* 746 F.2d at 1568 ("[T]he theory must be rejected because it rests on

the assumption that one's reputation is a monolith, which stands or falls in its entirety ... [e]ven the public outcast's remaining good reputation, limited in scope though it may be, is not inconsequential").

Here, however, Denver Publishing has not contended that Tonnessen is a "libel-proof plaintiff." Nor does this case concern allegations of two separate acts. Therefore, it does not present the concerns raised in *Liberty Lobby, Inc. v. Anderson, supra.*

Rather, the reporting by Denver Publishing was of two separate repetitions of an identical accusation: that Tonnessen forced his wife to have sex with him. Tonnessen was not being accused of one crime by the wife and another by the sister, or even of committing two separate sexual acts. In our view, the harm to Tonnessen's reputation, which he has alleged arose from the wife's rape allegation, flowed from and was caused by the reporting of her in-court testimony. There is no suggestion anywhere that the sister had any independent knowledge of what actually occurred between Tonnessen and the wife, and the newspaper's act of adding the sister's words about what the wife had told her did not do more than convey the same allegation contained in the privileged, non-actionable statement.

We consider the analysis in *Herbert v. Lando, supra,* to be applicable and conclude that the reporting of the sister's words is not actionable as a matter of law under this limited application of the incremental harm doctrine. The sister's words merely imply the same view and are simply an outgrowth and subsidiary to those claims upon which it has been held there can be no recovery, and any damage attributed to the repetition of the wife's rape allegation through the sister's statement would be nominal.

To hold otherwise would allow Tonnessen to do indirectly what he could not do directly; that is, to make Denver Publishing liable for accurately reporting the wife's in-court statement. *See* Daly, *The Incremental Harm Doctrine: Is There Life After Masson?,* 46 Ark. L.Rev. 371, 385–86 (1993).

Accordingly, we conclude the trial court did not err in dismissing Tonnessen's defamation claim against Denver Publishing.

In view of this disposition, we need not consider whether the statements were otherwise privileged under the First Amendment as Denver Publishing maintains.

## II. Invasion of Privacy

Tonnessen next contends the trial court erred in finding that the facts published by Denver Publishing were already in the public domain, and thus could not support a claim for invasion of privacy. We disagree.

The right of privacy may be invaded in several different ways, including unreasonable publicity given to another's private life. *Robert C. Ozer, P.C. v. Borquez,* 940 P.2d 371 (Colo.1997).

In order to prevail on a claim for invasion of privacy through unreasonable publicity given to one's private life, the following requirements must be met: (1) the fact or facts disclosed must be private in nature; (2) the disclosure must be made to the public; (3) the disclosure must be one which would be highly offensive to a reasonable person; (4) the fact or facts disclosed cannot be of legitimate concern to the public; and (5) the defendant must have acted with reckless disregard of the private nature of the fact or facts disclosed. The disclosure of facts that are already public will not support a claim for invasion of privacy. *Robert C. Ozer, P.C. v. Borquez, supra.*

It is undisputed that the basic facts of Tonnessen's dissolution of marriage case had already been revealed to the public through intense media scrutiny before publication of the articles at issue here. Hence, a requisite element of the tort is missing. Tonnessen, however, relies on the publication of the first names of his two minor children by another marriage. But, these facts were also already publicly available, and we agree with the trial court that they do not support his claim for invasion of privacy.

### III. Outrageous Conduct

Tonnessen next contends the trial court erred in dismissing his claim for outrageous conduct. Again, we disagree.

■ Before permitting a plaintiff to present a claim for outrageous conduct to the jury, the trial court must rule on the threshold issue of whether the plaintiff's allegations of outrageous conduct are sufficient as a matter of law. *Coors Brewing Co. v. Floyd*, 978 P.2d 663 (Colo.1999).

■ Liability for outrageous conduct can be found only if the conduct is so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. *Coors Brewing Co. v. Floyd, supra.*

■ The facts alleged in Tonnessen's complaint, accepted as true, indicate that Denver Publishing printed the names of his children and certain other facts and allegations concerning him. However, we have already concluded that the article was neither defamatory nor an invasion of privacy, and thus, printing it could not constitute outrageous conduct.

Finally, the complaint alleges that a reporter from the *Rocky Mountain News* attempted to get Tonnessen to violate the gag order that had been issued in the dissolution of marriage action, and had lied to several of his clients in an attempt to get the clients to talk to the reporter. However, these allegations, even taken as true, still do not meet the requirements of outrageous conduct. *See Coors Brewing Co. v. Floyd, supra.*

Because we conclude that reasonable people could not find the behavior to be beyond all possible bounds of decency, the trial court did not err in dismissing the outrageous conduct claim.

Judgment affirmed.

Judge KAPELKE and Judge CASEBOLT concur.