FILED
United States Court of Appeals
Tenth Circuit

**July 19, 2011**

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

JERRY LEE BUSTOS,

      Plaintiff - Appellant,

v.

A&E TELEVISION NETWORKS,

      Defendant - Appellee.

No. 10-1253

Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:08-CV-00153-LTB-MEH)

Paul J. Kyed (Buck S. Beltzer, Christopher L. Larson, and J. Kevin Bridston with
him on the briefs), Holland & Hart, LLP, Denver, Colorado, for Plaintiff-
Appellant.

Steven D. Zansberg (Thomas B. Kelley with him on the briefs), Levine Sullivan
Koch & Schulz, L.L.P., Denver, Colorado, for Defendant-Appellee.

Before **MURPHY, GORSUCH,** and **MATHESON**, Circuit Judges.

**GORSUCH**, Circuit Judge.

      Can you win damages in a defamation suit for being called a *member* of the

Aryan Brotherhood prison gang on cable television when, as it happens, you have

merely *conspired* with the Brotherhood in a criminal enterprise? The answer is no. While the statement may cause you a world of trouble, while it may not be *precisely* true, it is *substantially* true. And that is enough to call an end to this litigation as a matter of law.

Jerry Lee Bustos is a longtime inmate at the federal supermax facility at Florence, Colorado. Back in 1998, he was chatting with a few acquaintances on the prison yard when another inmate — who seemed to be walking along minding his own business — punched Mr. Bustos in the back of the head. Mr. Bustos wasn't one to back down from an unprovoked attack and the pair quickly squared off as other residents of Florence looked on. After a few minutes, baton-toting prison guards stepped in, but by then Mr. Bustos had caught a few good punches and was no better for the wear.

Unfortunately for Mr. Bustos, the entire episode was captured by a prison surveillance camera. And worse, A&E Television Networks got a hold of the footage and featured it on its national cable television show, *Gangland: Aryan Brotherhood*. The program paired images of Mr. Bustos with a stentorian narrator who described the Aryan Brotherhood prison gang, its white-supremacist views, and its violent history.

Mr. Bustos complains that this in-all-ways-unsolicited television appearance has caused him an acre of difficulty. He says the program's suggestion that he is a member of the Aryan Brotherhood has devastated his

popularity around the jail.  The Brotherhood, it turns out, did not appreciate his publicly appearing as a member without their invitation.  And *other* gangs have also apparently become leery that Mr. Bustos might be a clandestine member of the Brotherhood.  So now, Mr. Bustos complains, he has received death threats and for his own safety can't be transferred to a less restrictive form of custody.  Despite his best efforts, he just can't convince his fellow prisoners that he's not actually a member of the Aryan Brotherhood.

Frustrated by all this, Mr. Bustos brought a defamation suit against A&E under Colorado law.  The district court agreed that the show effectively called him a member of the Aryan Brotherhood, and that the statement was defamatory, but it entered summary judgment against Mr. Bustos all the same.  This because, the court found, the statement was *substantially* true — and a substantially true statement isn't actionable in defamation.  It is this result Mr. Bustos now appeals.

A statement is defamatory if it "tends [] to harm the reputation of another [so] as to lower him in the estimation of the community or to deter third persons from associating or dealing with him."  *Burns v. McGraw-Hill Broad., Co.*, 659 P.2d 1351, 1357 (Colo. 1983), citing Restatement (Second) of Torts § 559 (1976) ("RST").  Before us, the parties take it for granted that A&E called Mr. Bustos a member of the Aryan Brotherhood and that this statement is defamatory.  But to concede that a statement is defamatory is just to say it hurts.  It says nothing about the truth of the matter.  In fact, long ago English *criminal* law took the view

that the truth was not only not a defense to a defamation charge but an aggravating circumstance — so that it was actually (if remarkably to contemporary ears) said, "the greater the truth the greater the libel." *See* Laurence H. Eldredge, The Law of Defamation § 64 (1978). Truth was no defense to a criminal defamation charge because the law cared less about the niceties of personal reputations and free speech than with keeping a lid on public violence and civil unrest. *Id.* Even truthful defamation demanded punishment because of its tendency, in the Star Chamber's estimation, to "incite[]. . . quarrels and breach of the peace, and [to] be the cause of shedding of blood, and of great inconvenience." *De Libellis Famosis Case*, 77 Eng. Rep. 250, 251 (Star Chamber 1606). Still, this only tells at most half the story. For its part, English *tort* law took a very different turn, denying compensation to a party truthfully defamed. It did so on the theory that if the statement is true, the plaintiff hadn't suffered any injury — or at least not any injury he didn't well deserve. 3 William Blackstone, Commentaries *124-25. So, in a twist worthy of an award from the Circumlocution Office, the truth could spare a defendant of liability in civil court only to condemn him to prison in a criminal court across the way.

Sensibly, American courts took their cue from the tort side of the English common law. *See* Rodney A. Smolla, Law of Defamation § 5:3 (2d ed. 2010). So a defendant who truthfully calls the plaintiff a member of the Aryan Brotherhood doesn't suffer any liability, no matter how much the statement may have defamed

- 4 -

or hurt the plaintiff's reputation in the public's estimation. Neither does it matter if the defendant doesn't know the truth of the matter when he makes the defamatory statement. So long as what he says turns out to be true, he is free from liability; the truth, whenever discovered, serves as a complete defense. *See* RST § 581A, cmt. h; W. Page Keeton, Prosser and Keeton on Torts § 116, at 840-41 (5th ed. 1984). In American law, defamation is not about compensating for damage done to a false reputation by the publication of hidden facts. It's about protecting a good reputation honestly earned.

This defense has, in comparatively recent years, taken on a constitutional patina, becoming not just a feature of the common law but a First Amendment imperative. *See New York Times v. Sullivan*, 376 U.S. 254 (1964). It has also undergone a partial transmogrification. Where truth was once strictly a defense, now the plaintiff must shoulder the burden in his case-in-chief of proving the *falsity* of a challenged statement if he is a public figure or the statement involves a matter of public concern. *See Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 775 (1986). In its enthusiasm, Colorado has taken all this a step further, apparently requiring the plaintiff in these circumstances to show the falsity of a defamatory statement by "clear and convincing evidence." *See Smiley's Too, Inc., v. Denver Post Corp.*, 935 P.2d 39, 41 (Colo. App. 1996).

Because no one disputes that our case involves a matter of public concern, it falls to Mr. Bustos to carry this exacting burden. But what exactly does Mr.

Bustos have to do to show that the statement he challenges is "false"? Under Colorado law, much as elsewhere, it is not enough for the plaintiff to show that the defendant got some innocuous detail wrong; the plaintiff must show that the challenged defamatory statement is not just false but material. *See Gomba v. McLaughlin*, 504 P.2d 337, 338-39 (Colo. 1972). A report that the defendant committed 35 burglaries when he actually committed 34 isn't enough to warrant relief. *See Liberty Lobby, Inc. v. Anderson*, 746 F.2d 1563, 1568 n.6 (D.C. Cir. 1984), *overruled on other grounds*, 477 U.S. 242 (1986). Neither is a report that mistakenly says that the plaintiff stabbed a man *in* Cheyenne, Wyoming when he really stabbed a man *from* Cheyenne, Wyoming. *Gomba*, 504 P.2d at 338-39. Unless a statement contains a *material* falsehood it simply is not actionable. *See Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991) ("Minor inaccuracies do not amount to falsity so long as the substance, the gist, the sting, of the libelous charge be justified." (internal quotation omitted)).

But to say that the misstatement must be material only raises questions of its own — material *to whom?* And *for what purpose?* The answer to these questions takes us back to and can be found in the interest the American defamation tort is intended to protect — the plaintiff's public reputation. Because *this* is the particular purpose the defamation tort is aimed at, we assess the materiality of a misstatement by comparing the damage it has done to the plaintiff's public reputation to the damage the truth would have caused. *See*

*Gomba*, 504 P.2d at 338; Colo. Jury Inst. Civ. 22:13 (defining falsity); *Wade v. Olinger Life Ins. Co.*, 560 P.2d 446, 452 n.7 (Colo. 1977) (explaining persuasive authority of Colorado jury instructions). To qualify as *material* the alleged misstatement must be likely to cause reasonable people to think "significantly less favorably" about the plaintiff than they would if they knew the truth; a misstatement is not actionable if the comparative harm to the plaintiff's reputation is real but only modest. Colo. Jury Inst. Civ. 22:13; *see also Pope v. Chronicle Pub. Co.*, 95 F.3d 607, 613 (7th Cir. 1996) (publication "must make the plaintiff significantly worse off than a completely or literally truthful publication would have"). Neither do we measure this comparative impact from the viewpoint of prison gang members — or for that matter from the viewpoint of any similarly insular group whose reactions may be different than the mainstream of contemporary society. Instead, the relevant inquiry is what a reasonable member of the (law abiding) contemporary community would make of the challenged statement. *See* Colo. Jury Inst. Civ. 22:13; *see also Burns*, 659 P.2d at 1357; *Tonnessen v. Denver Publishing Co.*, 5 P.3d 959, 963 (Colo. App. 2000) (requiring that a statement "prejudice the plaintiff in the eyes of a substantial and respectable minority of the community"); RST § 559, cmt. e, illus. 3.

By requiring a *significant* impact on the plaintiff's public reputation when compared to the truth, the material falsehood requirement works as a screen against trivial claims. *See Gomba*, 504 P.2d at 236. And this requirement is

hardly unique to defamation law; the plaintiff or prosecution in many tort and criminal contexts — fraud and perjury are two obvious examples — must also prove not just a falsehood but a *material* falsehood as part of its case-in-chief. *See* RST § 538, cmt. e (an allegedly fraudulent misrepresentation is material if "a reasonable man would have regarded the fact misrepresented to be important in determining his course of action"); Model Penal Code § 241.1 (1962) (in perjury proceedings a "[f]alsification is material . . . if it could have affected the course or outcome of the proceeding"). After all, without such a limitation, *every* error in detail — no matter how slight or irrelevant in the scheme of things — could lead to not just protracted civil proceedings but also criminal liability. And while the law is often demanding, rarely is it so punctilious.

Some have suggested that this same essential screening function might be better served by an "incremental harm" rule. *See*, *e.g.*, Kevin L. Kite, *Incremental Identities: Libel-Proof Plaintiffs, Substantial Truth, and the Future of the Incremental Harm Doctrine*, 73 N.Y.U. L. Rev. 529, 562-63 (1998). As it is typically described, an incremental harm rule seeks to compare the allegedly false statements about the plaintiff in a particular publication with unchallenged (or true) statements *found in the same publication*. It then permits recovery only if the false statements do some harm over and above the damage caused by the true ones. *Id.* at 543-43. But this alternative hasn't been adopted by the Colorado

Supreme Court (to date, at least) and it's open to criticism for being simultaneously both too narrow and too broad.

Too narrow because incremental harm depends on what happens to be contained in the same publication. Inexplicably, a defendant may lose the defense simply because he didn't publish as many bad facts about the plaintiff as he could have. But even more troubling is the doctrine's breadth. If an article calls Benedict Arnold a thief and a traitor, the "incremental harm" done by the first statement might be nothing compared to the unassailable truth of the second (entirely unrelated) statement, and this would leave Mr. Arnold to recover nothing for the patently false and defamatory accusation that he's a thief. *See Liberty Lobby*, 746 F.2d at 1568. In this way, an incremental harm rule assumes that an individual's reputation is "a monolith which stands or falls in its entirety." *Id.* And common experience suggests this premise is a doubtful one — a liar and a thief, after all, may still be a good family man — and saying otherwise may still do material damage to his public reputation. *Id.* Taken to its logical conclusion, moreover, incremental harm analysis suggests that individuals with really bad reputations in one area may be "libel proof" in all areas, free game for the publication of even the most outrageous and damaging lies. Call Benedict Arnold whatever you like; his public reputation is already so soured by his treason that no incremental harm could be done to it. *See id.* at 1569 (calling the libel-proof plaintiff a "bad idea").

The material falsehood requirement that Colorado *does* recognize serves the same screening function as incremental harm while avoiding these hidden complications. Both doctrines compare the harm of a lie with the harm of the truth. But the material falsehood requirement allows us to consider true facts wherever and whenever discovered, doing away with incremental harm's seemingly arbitrary fixation on what happens to have been included in the same publication. At the same time, the material falsehood requirement narrows our comparison to statements on the same subject matter, making the task more amenable to judicial determination and the outcome more predictable to potential litigants. The incremental harm (or libel-proof plaintiff) analysis asks courts to compare harms flowing from statements on radically different matters that may even be incommensurable — which is worse, a perjurer or an inside trader? a liar or a cheat? By contrast, the material falsehood analysis focuses judicial attention on the comparatively narrow question whether the *particular* challenged statement is true or false on its *own terms* — a task that falls well within the traditional (if human and imperfect) truth-finding function of juries and judges. *See* RST § 581A, cmt. f; *Liberty Lobby*, 746 F.2d at 1568 n.6.[*]

---

[*] The only case we have found in Colorado discussing the incremental harm doctrine, by an intermediate court, seems to require nothing more than this. *See Tonnessen*, 5 P.3d at 965-66. That case involved a newspaper reporting statements on the courthouse steps that were essentially identical to testimony that had just been given inside. Under the doctrine of fair report, the newspaper was immune for publication of the statements made *inside* the courtroom. *Id.* at

(continued...)

To be sure, the questions whether a statement is *defamatory* and whether it contains a *material falsehood* sometimes overlap. What's the difference between saying that the plaintiff sucker-punched an elderly man on St. Patrick's Day, when the truth is that he bashed the elderly man with a club on a different day in March? If the plaintiff complained only about the misstatement of the date of the attack, he would lose for two reasons: nothing about the date is defamatory and in any event the error has no apparent material significance. But sometimes the material falsehood requirement does distinct and important work. If the same plaintiff complained about the statement that he had sucker-punched the old man, the statement is surely a defamatory one. Yet the plaintiff still might not recover because the statement could be found substantially true — the report might have been wrong about how he went about beating the old man, but it isn't at all obvious that the difference is one that matters for purposes of the plaintiff's public reputation.

---

*(...continued)
964-65. But theoretically it could have been liable for reporting the *exact same statements* made on the steps outside. *Tonnessen* avoided this absurdity by recognizing a "limited application of the incremental harm doctrine," holding that the newspaper could not be liable for the "two separate repetitions of an identical accusation." *Id.* at 966. Given the facts of that case, we can't say whether this was actually an application of the incremental harm doctrine or just a logical extension of the doctrine of fair report. But, notably, *Tonnessen* stops well short of incremental harm's suggestion that judges and juries should compare the defamatory harm of disjoint and unrelated statements. *See id.* at 965 ("[T]he fact that an individual has done one bad thing does not necessarily mean the individual has done another entirely separate bad act.").

Unsurprisingly, deciding the materiality of a falsehood often requires a jury. Whether a particular misstatement is likely to injure the plaintiff's reputation in the mind of a reasonable member of the community is often best decided by reasonable members of the community. But like nearly any other element of a tort this one is amenable to resolution at summary judgment when, viewing the facts in the light most favorable to the non-movant, the answer is beyond cavil. *See Anderson v. Cramlet*, 789 F.2d 840, 842-43 (10th Cir. 1986). And our review of the undisputed facts in this case persuades us that it is such a case — that no reasonable juror could find A&E's defamatory statement was materially false, let alone do so clearly and convincingly as Colorado law requires.

We don't doubt that the public thinks worse of Aryan Brotherhood prison gang members than standard-issue prisoners. But that only means A&E's statement — its indication that Mr. Bustos is a member of the Aryan Brotherhood — is defamatory or hurtful to his public reputation. We must still compare A&E's statement against the truth of the matter. And on that score the facts reveal that, while Mr. Bustos isn't formally a *member* of the Brotherhood, he surely did *affiliate* with the organization. In the A&E footage, Mr. Bustos is seen chatting with two Aryan Brotherhood members and a member of yet another gang up until the moment he gets punched. And his relationship with the Brotherhood hasn't been limited to rec yard chats. In a conspiracy ultimately detected and

- 12 -

disrupted by prison officials, Mr. Bustos agreed to receive balloons filled with heroin from a prison visitor; insert them into his body; and then pass them along to three prison gangs, including the Aryan Brotherhood. When things went awry, Mr. Bustos found himself — balloons and all — locked in solitary confinement. After this delay upset certain intended recipients, Mr. Bustos sent a handwritten apology to an Aryan Brotherhood leader. The note — which refers to the leader repeatedly as "bro" — explains the situation and promises the balloons will soon be on their way. It concludes by sending Mr. Bustos's "respect" and asking the Aryan Brotherhood leader to "give my regards" to still three other Brotherhood members.

Comparing the challenged defamatory statement (*membership* in the Aryan Brotherhood) to the truth (*conspiring* with and *aiding and abetting* the Aryan Brotherhood), we cannot see how any juror could find the difference to be a material one — that is, likely to cause a reasonable member of the general public to think significantly less favorably of Mr. Bustos. The difference or delta between the defamatory statement and the truth *might* cause some modicum of additional injury to his reputation, that we don't deny, but it is not one a juror could find likely to be significant to a reasonable person. Tellingly, Mr. Bustos points to nothing in the record he has developed through the entire discovery phase of this case suggesting that his standing in the public eye would be

improved *at all* by more careful explication of the true particulars of his involvement with the Brotherhood.

Notably, too, this court and others have found similar and arguably greater factual discrepancies immaterial as a matter of law. For example, this court has held it immaterial that the plaintiff was wrongly labeled a "kidnapper" when he was actually convicted of violating a custody order. *Anderson*, 789 F.2d at 843-45. Others have held immaterial statements that a judge "ordered" the parties to settle when in fact the judge only "recommended" a settlement — and that a person was "fired" when in truth he'd voluntarily resigned under less than favorable circumstances. *See Tex. Monthly, Inc. v. Transamerican Natural Gas Corp.*, 7. S.W.3d 801 (Tex. App. 1999); *Picard v. Brennan*, 307 A.2d 833 (Me. 1973). Still other courts have rejected a complaint by a father who had allegedly left his children at home alone at night when the facts showed him an unreliable caretaker in other respects — and said it didn't matter whether a plaintiff had committed perjury or merely given evasive testimony. *See Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1226-29 (7th Cir. 1993); *Riley v. Harr*, 292 F.3d 282, 295-98 (1st Cir. 2002). We can hardly see how the falsity of A&E's statement could be considered any more material than these and the other discrepancies courts have held immaterial as a matter of law.

Perhaps most pointedly of all, the Sixth Circuit rejected a defamation suit brought by James (brother of Terry) Nichols against movie maker Michael Moore.

- 14 -

In the movie, Moore reported that James Nichols was "arrested in connection" with the Oklahoma City bombing. Actually, Nichols was arrested for an unrelated explosives offense and was considered only a material witness in connection with the Oklahoma City bombing. *See Nichols v. Moore*, 477 F.3d 396, 398, 401 (6th Cir. 2007). The Sixth Circuit recognized that there's *some* difference between being a suspected participant in a heinous bombing and being a material witness in the investigation. But, the court held, the distinction to the respectable community member wasn't significant enough to make the misstatement actionable. By comparison, of course, Mr. Bustos isn't just someone who was a material witness to the Aryan Brotherhood's criminal designs. He has personally participated in the Brotherhood's unlawful activities, making him even more obviously associated with the reviled group than the plaintiff in *Nichols*.

Mr. Bustos protests that calling him a member of the Aryan Brotherhood has a special sting given that he's Hispanic. He reminds us that the Aryan Brotherhood is a white-supremacist organization, and argues that falsely associating him with the group suggests that he's someone who has "renounc[ed] his Hispanic heritage." But even granting all this to Mr. Bustos for argument's sake, the *truth* is that he *did* intentionally aid and abet the Brotherhood. And having willingly helped the Brothers flout prison security measures as part of a criminal conspiracy, it's a few years too late to take a principled stand against

- 15 -

their agenda. To the extent reasonable persons would find the views and practices of the Brotherhood abhorrent — and surely they would — they would *also* be appalled that Mr. Bustos has given that group his aid and comfort, risking administrative and criminal sanction to help their cause.

Of course, this isn't to say that *no one* makes a distinction between the Aryan Brotherhood's criminal accessories and its full-fledged members; it's almost certain, for example, that the Brotherhood does. But, as we have explained, defamation doesn't vindicate factual mistakes of consequence only to such insular groups. And the harms Mr. Bustos alleges as a result of these misunderstandings come down to an increased risk of violence and disruption of the existing prison order — allegations unrelated to any damage done to Mr. Bustos's public reputation. Inciting prisoners to violence might have been cause to indict A&E for defamation at one time under English criminal law, but it's not actionable under contemporary American law.

Mr. Bustos replies that there is still at least one way in which the difference between being called a member and an accessory matters, one more material distinction we haven't yet considered. A&E's program took great pains to inform the viewing public of the Brotherhood's so-called "blood in, blood out" rule — the principle that one must commit a homicide or an attempted homicide to be inducted as a full-fledged member. This, Mr. Bustos says, makes the difference between being a member and an accessory a material one, because the respectable

public would surely think worse of him if he *murdered*. But this line of attack, however promising on first glance, runs headlong into the truth. Whether A&E knew it at the time, after discovery we all know now that Mr. Bustos *has* at least one brutal gang-related attempted homicide in his past. So in this respect the difference between truth and falsity is not just immaterial — it doesn't exist. There is no falsity, let alone a material one, when it comes to A&E's challenged implication that Mr. Bustos has at least attempted murder. He has.

Of course, A&E tries to pile on, spending much of its brief dwelling on Mr. Bustos's ties to *another* gang (the Mexikanemi, or Texas Mexican Mafia) and his lengthy record of violent behavior in and out of prison — including convictions for burglary, robbery, and escape. The point of all this, A&E says, is that any further harm to Mr. Bustos's public reputation is impossible; he is libel-proof, at least when it comes to matters of violent crimes and prison gang membership. But we have already explained our reluctance to venture down this path. Instead of attempting a far-ranging incremental harm or libel-proof plaintiff analysis — instead of trying to compare the "badness" of A&E's Aryan Brotherhood statement with the "badness" of Mr. Bustos's life story viewed in full — we hold only that the narrow and particular defamatory statement Mr. Bustos chose to challenge (being labeled a member of the Aryan Brotherhood) is *itself* substantially true as a matter of law.

Mr. Bustos's defamation claim is dismissed and the judgment is affirmed.

Mr. Bustos's motion to strike portions of A&E's answer brief is denied as moot.

The redacted briefs filed on March 18 and 21, 2011 are ordered unsealed.