24CA0908 Palombo v Denver Post 05-15-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 24CA0908
City and County of Denver District Court No. 24CV30224
Honorable Stephanie L. Scoville, Judge

Angelo Palombo and Star Farms, Inc.,

Plaintiffs-Appellants,

v.

The Denver Post Corporation and Sam Tabachnik,

Defendants-Appellees.

JUDGMENT AFFIRMED AND CASE
REMANDED WITH DIRECTIONS

Division II
Opinion by JUDGE HARRIS
Fox and Schutz, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced May 15, 2025

Cohen, LLC, Jeffrey Cohen, Donovan Estrada, Denver, Colorado, for Plaintiffs-Appellants

Zansberg Beylkin LLC, Steven D. Zansberg, Michael Beylkin, Denver, Colorado, for Defendants-Appellees

¶ 1    Plaintiffs, Star Farms and its owner, Angelo Palombo (collectively, Star Farms), sued defendants, The Denver Post Corporation and reporter Sam Tabachnik (collectively, the Post), for defamation and other torts after the Post published an article about Star Farms' treatment of its seasonal employees.  The district court granted the Post's special motion to dismiss under section 13-20-1101, C.R.S. 2024, commonly known as Colorado's anti-SLAPP (strategic lawsuit against public participation) statute.

¶ 2    Star Farms appeals, arguing that the anti-SLAPP statute does not bar its claims because the article does not concern a matter of public interest and, even if it does, Star Farms was likely to succeed on its defamation claim.  We affirm.

I.    Background

¶ 3    Star Farms, a commercial fruit and vegetable farm in Brighton, Colorado, hires foreign seasonal workers each year through the H-2A federal visa program.  In July 2023, the farm filed a petition for bankruptcy protection.  The petition acknowledged

that Star Farms had not paid its employees for the preceding five weeks and that it owed its seasonal employees $231,272.30 in gross wages.

¶ 4     Star Farms later filed a motion requesting that the bankruptcy court authorize it to pay the pre-petition wages owed to employees. The court granted the motion on August 10, 2023.

¶ 5     On September 19, 2023, the Post published an article written by Tabachnik under the headline "This Colorado farm has repeatedly violated federal labor laws. Why does the U.S. continue to grant it foreign workers?"  The article included the following statements:

- "Sixty-five seasonal workers . . . work on the 471-acre farm in Weld County."

- "According to interviews and . . . a review of court documents and inspection reports," "[f]or nearly two decades, Star Farms and its owner, Angelo Palombo, have repeatedly stolen wages from migrant employees and violated federal labor laws."

- "In 2006, the U.S. Department of Labor [DOL] found nine violations at Star Farms, including five related to the Migrant and Seasonal Agricultural Worker Protection Act [Migrant Worker Act]. Another four concerned Occupational Safety and Health Administration infractions."

- A "2008 investigation [by] the [DOL] found 191 violations of the [Migrant Worker Act]" "impacting 140 laborers." The DOL "ordered $123,330.54 in back wages to be paid to workers."

- "In 2010, the [DOL] listed Star Farms as a repeat violator of the Fair Labor Standards Act."

- "Workers have sued Palombo and his company twice in federal court since 2008, alleging the farm owner failed to supply drinking water in the fields, provide clean restrooms[,] and pay them on time."

- "The laborers' attorneys" filed a federal lawsuit in 2015, alleging "systematic abuse and exploitation of low-wage, seasonal, agricultural workers."

3

- "In both the 2008 and 2015 federal lawsuits, Palombo agreed to settlements . . . in which he paid the workers and other laborers who also didn't see regular checks."

- "Court-ordered consent decrees also mandated that the farm owner . . . pay his workers on time, moving forward."

- According to the workers' lawyer, "[t]he farm owner . . . still owes money from the 2015 settlement."

- "It's been nearly eight years since Palombo agreed to [certain] terms in the second federal case.  But workers and their attorneys say nothing has changed.  The bathrooms still don't get cleaned.  There's still no clean water.  And, they say, the pay never seems to come on time."

- "The workers and their lawyers say" that "the workers at Star Farms haven't seen a paycheck in seven weeks."

- "[T]he [DOL] says it's once again investigating the farm."

- In a recent demand letter, the workers' attorneys told Palombo, "You continue to exploit these workers and profit off

their work while refusing to pay them the wages you have stolen from them."

- "Despite repeated fines and violations, the same federal agency, year after year, continues to allow Palombo to hire and take advantage of seasonal workers."

- "The plight of Star Farms' workers underscores the often exploitative nature of seasonal farm work in America. These migrant laborers, under the federal H-2A program, can only work for the employer who brings them into the country, making them captive and ripe for abuse, experts say."

- "Palombo, in an interview, told [t]he Post he 'pretty much' pays all his workers on time. Clean water is always available, he said, and the bathrooms get cleaned every other day."

- "Palombo told [t]he Post that he doesn't pass off costs to his employees and that he pays them regularly. He even allows workers to borrow money from him, he said."

¶ 6    In January 2024, Star Farms sued the Post, asserting claims for defamation, negligence, and intentional infliction of emotional distress.  Star Farms alleged that the article "contain[ed] false and intentionally misleading information pertaining to Star Farms' treatment of migrant workers."

¶ 7    The Post filed a special motion to dismiss the complaint under Colorado's anti-SLAPP statute.  *See* § 13-20-1101(3)(a).  In support of its motion, the Post submitted an affidavit from Tabachnik and the source material that he relied on in writing the article.

¶ 8    Following a nonevidentiary hearing, the district court granted the Post's motion in a thorough written order.  The court first determined, contrary to Star Farms' argument, that the article covered a matter of public interest and therefore fell within the scope of the anti-SLAPP statute.  The court then determined that Star Farms was unlikely to prevail on its claims because it had failed to produce sufficient evidence to establish falsity and actual malice.

## II. The Special Motion to Dismiss

¶ 9 On appeal, Star Farms contends that the district court erred on both fronts: it says that the anti-SLAPP statute does not apply because the article does not concern a "public issue," and it says that it is likely to prevail on the defamation claim because the Post omitted certain information that, if included, would have changed the overall gist of the article, thereby demonstrating the article's falsity.

### A. Overview of the Anti-SLAPP Statute and Standard of Review

¶ 10 Colorado's anti-SLAPP statute seeks to protect individuals' First Amendment rights to petition, speak freely, and otherwise participate in government and, at the same time, "protect the rights of persons to file meritorious lawsuits for demonstrable injury." § 13-20-1101(1)(a)-(b). To balance these interests, the statute implements a two-step process for weeding out non-meritorious lawsuits at an early stage of the proceedings. *See Salazar v. Pub. Tr. Inst.*, 2022 COA 109M, ¶ 21.

¶ 11    At step one, the defendant has the burden to show that the conduct underlying the plaintiff's claims falls within the statute — i.e., that the claim arises from the defendant's exercise of its right to petition or free speech. § 13-20-1101(3)(a). An act in furtherance of a person's right of petition or free speech includes "[a]ny written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest." § 13-20-1101(2)(a).

¶ 12    If the defendant shows that its conduct falls within the statute's scope, then, at step two, the burden shifts to the plaintiff to establish a reasonable likelihood that it will prevail on the claim. § 13-20-1101(3)(a). In making this determination, we "consider the pleadings and the supporting and opposing affidavits" offered by both parties. *Salazar*, ¶ 21; § 13-20-1101(3)(b). We "neither simply accept the truth of the allegations nor make an ultimate determination of their truth." *Id.* Instead, "we assess whether the

allegations and defenses are such that it is reasonably likely that a jury would find for the plaintiff." *Id.*

¶ 13 We review de novo a district court's ruling on a special motion to dismiss by conducting an independent review of the entire record. *Id.* at ¶¶ 20-21 (the review of a special motion to dismiss is similar to a review of the sufficiency of the evidence and is de novo).

## B. Step One: Protected Activity

¶ 14 We agree with the district court — indeed, we think it is beyond serious dispute — that the Post's article concerns issues of public interest. *See McIntyre v. Jones*, 194 P.3d 519, 525 (Colo. App. 2008) (explaining that a matter is "of public concern" when it relates "to any matter of political, social, or other concern to the community") (citation omitted); *see also Spacecon Specialty Contractors, LLC v. Bensinger*, 713 F.3d 1028, 1032, 1036 (10th Cir. 2013) (noting plaintiff's concession that the content of a film about "abuse and discrimination suffered by [Mexican construction] workers, including under-payment, misclassification of employees

9

as independent contractors, and trafficking of foreign workers" was a matter of public concern); *Overhill Farms, Inc. v. Lopez*, 119 Cal. Rptr. 3d 127, 137-38 (Cal. Ct. App. 2010) (accusations of discrimination and unjustified termination of migrant employees levied during a protest were matters of public concern); *Fells v. Serv. Emps. Int'l Union*, 281 A.3d 572, 582 (D.C. 2022) (sexual harassment at a labor union was a matter of public concern because "[h]ow workers are treated at one of our nation's largest labor unions undoubtedly relates to community well-being, so much so that the proposition approaches the self-evident").

¶ 15      Nonetheless, citing *Tender Care Veterinary Center, Inc. v. Lind-Barnett*, 2023 COA 114, Star Farms says there is an insufficient nexus between the article's statements and the issue of public interest.  It alleges that the article does not "meaningful contribute" to the broader discussion of exploitation of migrant workers, but instead merely "targets" Star Farms, "portraying [it] as [a] bad actor[]."

10

¶ 16    Star Farms' reliance on *Tender Care* is misplaced.  That case involved two customers' angry rants on semi-private Facebook pages about their experiences at a particular veterinarian's office.  *Id.* at ¶¶ 4-6.  The division concluded that although the comments might "theoretically" and abstractly relate to a matter of public interest — veterinary care — there was no real connection between the comments and the public issue, as they were not intended to, and did not, contribute to any broader discussion about pet health care.  *Id.* at ¶¶ 24-30.  Rather, the comments were posted for the purpose of "exact[ing] some revenge" in the context of a private dispute.  *Id.* at ¶ 31.

¶ 17    This case is easily distinguished.  Here, the challenged statements appear in a newspaper, not on a semi-private Facebook page.  *See Goguen v. NYP Holdings, Inc.*, 2024 MT 47, ¶ 10 (explaining that the press has "a preferred position in our constitutional scheme," as it "provid[es] information to the people which allows citizens to form judgments and to intelligently govern")

11

(citation omitted).  The article implicates government investigations and public policy issues, not a private dispute between customers and a business.  *See Tender Care*, ¶ 22 (explaining that defendants' statements "did not concern political or social issues, public officials, people or businesses that had been the subject of news articles, a large number of persons, or even a topic of widespread public interest") (footnote omitted).  The article expressly ties the circumstances at Star Farms to the broader issue of the treatment of migrant workers generally.  *See Gilbert v. Sykes*, 53 Cal. Rptr. 3d 752, 761-62 (Cal. Ct. App. 2007) (defendant's statements about her interactions with a particular doctor were sufficiently tied to a matter of public interest because they appeared on a website that also included general information helpful to the public).  And there is no evidence that the Post published the article to "exact revenge" or for any other illegitimate purpose.

¶ 18     To the extent Star Farms contends that the article could not contribute to the public discourse because certain statements were

12

false, we reject that contention.  The truth or falsity of a statement does not control whether the statement concerns an issue of public interest.  *See L.S.S. v. S.A.P.*, 2022 COA 123, ¶¶ 29-30.

¶ 19     Thus, we conclude that the Post satisfied its burden at step one to show that the article's statements directly relate to a matter of public interest.

### C.     Step Two: Likelihood of Prevailing on the Merits

¶ 20     Star Farms contends that even if the article contained true statements, it was rendered misleading or materially false, by the Post's omission of certain information.

### 1.     Defamation Law

¶ 21     Defamation is a communication that holds an individual up to contempt or ridicule, thereby causing injury or damage.  *Jogan Health, LLC v. Scripps Media, Inc.*, 2025 COA 4, ¶ 21.  Ordinarily, to prevail on a defamation claim, the plaintiff must prove by a preponderance of the evidence that the defendant made a defamatory statement to a third party, with fault amounting to at least negligence, and special damages caused by the defamatory

13

statement (or the actionability of the statement irrespective of special damages). *Id.* But when, as here, the alleged defamatory statement concerns a matter of public concern, a higher burden applies: the plaintiff must prove, by clear and convincing evidence, that the statements are false and that the defendant published the statements with actual malice — that is, with actual knowledge that they were false or in reckless disregard of the truth. *Lawson v. Stow*, 2014 COA 26, ¶ 18.

¶ 22 Substantial truth is all that is necessary to defeat a defamation claim. *Fry v. Lee*, 2013 COA 100, ¶ 49. Thus, to prevail, "the plaintiff must show that the challenged defamatory statement is not just false but material." *Bustos v. A & E Television Networks*, 646 F.3d 762, 764 (10th Cir. 2011) (applying Colorado law).

¶ 23 When the plaintiff alleges that the published statements themselves are false, courts assess the materiality of a misstatement by comparing the damage it has done to the plaintiff's

public reputation to the damage the truth would have caused. *Id.* "To qualify as material the alleged misstatement must be likely to cause reasonable people to think 'significantly less favorably' about the plaintiff than they would if they knew the truth; a misstatement is not actionable if the comparative harm to the plaintiff's reputation is real but only modest." *Id.* at 765 (citation omitted). So, for example, a plaintiff cannot prove materiality if the defamatory statement is that he "sucker-punched an elderly gentleman" *at* Cheyenne when the truth is that he assaulted an elderly gentleman *from* Cheyenne — because the "odium associated with the alleged act is equally . . . despicable" regardless of where it occurred. *Gomba v. McLaughlin*, 504 P.2d 337, 338 (Colo. 1972); *see also Bustos*, 646 F.3d at 767 (statement that plaintiff was a "member" of the Aryan Brotherhood was not materially false even though he was not a member, because he conspired with and aided and abetted the Aryan Brotherhood, and no "juror could find the difference to be a material one").

15

¶ 24    Similar principles apply when a plaintiff concedes that the statements themselves are not materially false but alleges that critical facts were omitted from the publication.  In that circumstance, courts assess materiality by determining whether the omitted facts, if included, would "produce a different effect than the version that was published."  *Fry*, ¶ 54.  In other words, the question is whether "the omitted facts created any material falsity by their omission."  *Id.* at ¶ 55.

¶ 25    But this variation of a defamation claim comes with an added wrinkle, at least when the defendant is a news organization.  "Every news story . . . reflects choices of what to leave out, as well as what to include."  *NBC Subsidiary (KCNC-TV), Inc. v. Living Will Ctr.*, 879 P.2d 6, 15 (Colo. 1994) (citation omitted).  Those decisions "must almost always be left to writers and editors," not to the government.  *Id.*  Thus, courts must "tightly cabin liability in this context."  *TMJ Implants, Inc. v. Aetna, Inc.*, 498 F.3d 1175, 1197 (10th Cir. 2007) (applying Colorado law).

16

## 2.  Discussion

¶ 26    Star Farms has abandoned any argument that the article's statements are materially false.  Instead, on appeal, it contends only that the Post omitted facts that, if included, would have produced such a different effect on the reader as to render the published version materially false.

¶ 27    It is somewhat unclear from Star Farms' brief what facts it alleges the Post omitted.  As best we can tell, it argues that the Post should have mentioned that in August 2023, Star Farms requested, and the bankruptcy court granted, authorization for the farm to pay the past due, pre-petition wages to its employees, including the seasonal workers.

¶ 28    Any argument that the Post should also have included in the article a statement that Star Farms had actually paid the wages by September 19, the date of publication, is not supported by the record.  The district court found that the evidence Star Farms submitted with its response to the motion to dismiss did not

17

establish that it had paid any of the overdue wages by September 19. Palombo's affidavit does not undermine that finding. His affidavit says only that he "informed" one of the farm's corporate customers that Star Farms had "substantially complied" with the bankruptcy court's order by September 19. But telling a third party (whose business the farm was attempting to regain) that Star Farms had mostly paid overdue wages is not the same as an averment that it did, in fact, pay all of its employees their wages by September 19 — and that averment is nowhere in the affidavit. Not only that, but Star Farms never alleged that the Post knew or should have known that he paid employees by September 19. The motion and order were contained in the bankruptcy court record, but Palombo did not say that evidence of payment could also be found in the record as of the publication date. And even though the reporter interviewed Palombo a few days before the article was published, Palombo has not alleged that he gave the reporter that information.

18

¶ 29    Therefore, we focus on whether the fact that Star Farms sought authorization to pay wages in the future, if included, would have materially changed the overall "gist" of the article.  *Fry*, ¶ 55.

¶ 30    Star Farms says yes, because in its view, the published version of the article "implied ongoing, willful refusal to pay wages." If a reference to the bankruptcy motion had been included, it argues, the reader would have had a substantially different view of Star Farms — that by September, it was "taking steps to rectify any prior delays."

¶ 31    The Post contends that Star Farms' interpretation of the published article is unreasonable.  It maintains that the gist of the article was that Star Farms was "being accused of continuing [its] pattern of not *timely* paying [its] migrant farm workers."  And in that context, the Post says, a reference to Star Farms' motion for authorization to "*begin paying* [its] workers their wrongfully withheld weekly wages" would not have produced a different effect on the reader.

¶ 32    Sometimes a dispute about the gist of the published article matters to the outcome, in which case the court must determine how a reasonable reader would understand the content. *See, e.g., CoreCivic, Inc. v. Candide Grp., LLC*, 46 F.4th 1136, 1144 (9th Cir. 2022) (When a plaintiff claims that a literally accurate statement is nonetheless defamatory, "the published statement must reasonably be understood as implying the alleged defamatory content.") (citation omitted). "In making such a determination, we 'must . . . refrain from scrutinizing what is not said to find a defamatory meaning which the article does not convey to a lay reader.'" *Id.* (citation omitted).

¶ 33    But even accepting Star Farms' interpretation of the article's gist, we conclude that the omission of any reference to the bankruptcy motion did not create a material falsity in the published article. The article detailed Star Farms' history of failing to pay its workers until either the DOL or the court intervened. Even then, according to the article, Star Farms sometimes failed to fully comply

20

with court orders or settlement agreements, including a consent decree that required Star Farms to improve deplorable working conditions at the farm. Though it had earlier agreed to pay its workers weekly, at the time Star Farms filed its motion in bankruptcy court, it had not paid the workers for nearly five weeks. Given this context, information that *after* it became subject to the bankruptcy court's oversight, Star Farms requested permission to pay its workers (who, the motion explained, all had priority claims that would be paid anyway) would not have substantially changed the overall gist of the published article, even if the gist was, as Star Farms says, that the farm did not want to pay its workers. *See Fry*, ¶ 55 (While including the plaintiff's apology "might have provided a more well-rounded picture," given that she plagiarized, denied it, then changed her story only after being confronted, including the omitted information would not have changed the "overall truthful gist of the article.").

¶ 34 Star Farms insists that the omitted facts must have been material because a corporate customer that canceled a contract upon reading the article then reinstated it upon being informed of the "omitted facts." That argument does not hold up, though, because the "omitted facts" provided to the customer are not the same "omitted facts" at issue on appeal. Rather, in a letter dated December 7, 2023, months after the article's publication, Star Farms told its customer that "as of the date of th[e] letter, all Star Farms employees have been paid in full." It also denied other aspects of the article, including that the workplace lacked clean water and suitable restrooms. In any event, even if the "omitted facts" were the same, Star Farms "is [not] entitled to relief solely because of the possibility that some minority of readers" might have found the omitted facts important. *Id.* at ¶¶ 56-57.

¶ 35 In sum, we agree with the district court that Star Farms cannot show that the omission concerning the bankruptcy motion created a material falsity in the published article. Therefore, Star

22

Farms is not reasonably likely to prevail on its defamation claim or the ancillary tort claims. *See id.* at ¶¶ 61-62 (claims ancillary to a defamation claim cannot survive dismissal of the defamation claim).

¶ 36 In light of our conclusion, we need not address Star Farms' argument that it also could have proved malice.

### D. Appellate Attorney Fees

¶ 37 "[A] prevailing defendant on a special motion to dismiss is entitled to recover [its] attorney fees and costs." § 13-20-1101(4). Because the Post is a prevailing defendant under the statute, we grant its request for an award of its reasonable appellate attorney fees. *See Creekside Endodontics, LLC v. Sullivan*, 2022 COA 145, ¶ 54. We exercise our discretion under C.A.R. 39.1 to remand the case to the district court to determine the amount of attorney fees to which the Post is entitled.

### III. Disposition

¶ 38 The judgment is affirmed. The case is remanded to the district court for an award of the Post's reasonable appellate attorney fees.

JUDGE FOX and JUDGE SCHUTZ concur.